Jefferson Insurance Co. of New York *v.* National Union Fire Insurance Co.

THE JEFFERSON INSURANCE COMPANY OF NEW YORK *vs.*
NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA.

No. 95-P-1618.

Essex. June 11, 1996. - January 27, 1997.

Present: DREBEN, GILLERMAN, & LAURENCE, JJ.

*Insurance,* General liability insurance, Coverage, Construction of policy,
Insurer's obligation to defend. *Negligence,* Ambulance. *Words,* "Profes-
sional services."

Discussion of cases in Massachusetts and other jurisdictions considering
the "professional services" exclusion in a general liability insurance
policy. [97-101]
An ambulance company's delay in response to a medical emergency caused
by a miscommunication between the company's radio dispatcher and
the ambulance attendants regarding the address to which to proceed
was not conduct constituting "professional services" within the meaning
of a professional services exclusion in the company's general liability in-
surance policy with the result that the insurer breached its duty to
defend its insured by refusing to participate in the defense or settlement
of a negligence action brought against the ambulance company. [101-105]

CIVIL ACTION commenced in the Superior Court Depart-
ment on November 18, 1991.

The case was heard by *Charles M. Grabau,* J., on motions
for summary judgment.

*Dina B. Browne* for the plaintiff.

*Joseph B. Bertrand* for the defendant.

LAURENCE, J. Two insurance companies here clash over
whose policy should provide coverage to their common
insured, an ambulance company sued for negligence. The al-
leged negligent conduct was delay on the part of the
company's ambulance, summoned by the local police to re-

spond to a medical emergency,[1] in arriving at the residence of a man who had collapsed with chest pain. The stricken individual died shortly after being transported by the ambulance to a nearby hospital emergency room. An action brought against the company by the decedent's administratrix and widow attributed the death to that delay.[2] There is no dispute that the delay was occasioned by miscommunication between the company's radio dispatcher and the ambulance attendants regarding the address to which the ambulance was told to respond.[3]

The appellant, The Jefferson Insurance Company of New York (Jefferson), had issued an "Ambulance Attendants Errors and Omissions" policy (E & O policy) to the ambulance company shortly before the incident triggering the litigation.[4] Jefferson defended the ambulance company against the tort action and eventually settled the matter before trial for $75,000. During the pendency of the action, Jefferson had asked the appellee, National Union Fire Insurance Company of Pittsburgh, Pa. (National), to contribute to both the defense and the settlement, based upon National's issuance of a "Comprehensive General Liability Policy" (CGL policy) to the ambulance company during the year in which the incident

---

[1] The ambulance company had contracted with the municipality (Peabody) in which the emergency occurred to provide such service.

[2] The complaint also alleged further negligent delay by the ambulance attendants at the decedent's residence and breach of the ambulance company's contractual obligations to the municipality, but those allegations are not at issue in this appeal.

[3] The miscommunication consisted either of the dispatcher's misrouting the ambulance or of the attendants' mistake in proceeding to the wrong address.

The decedent had collapsed at his residence, 6 Rockdale Park, Peabody. The local police, called by the decedent's wife, had contacted the company's dispatcher, pursuant to the company's contract with Peabody. The dispatcher told the company's ambulance, standing by in an adjacent town and staffed by two trained emergency medical technicians, "to respond to 6 Rockdale." The ambulance driver assumed that this meant "Rockdale Avenue," as did her colleague, who had looked into a "map book" under "Rockdale" in Peabody and found a listing for Rockdale Avenue. After failing to discover any residence numbered 6 at Rockdale Avenue, the attendants called the dispatcher, who then "told [them] it was [6] Rockdale Park."

[4] Jefferson's E & O policy generally covered damages "arising out of the performance of services . . . in connection with . . . [the] business of ambulance service."

occurred.[5] National, however, refused to participate in either the defense or the settlement, apparently relying upon National's CGL policy exclusion of coverage for "the rendering of or failure to render . . . medical . . . or nursing services [or] any service or treatment . . . of a professional nature" (the professional services exclusion).[6]

Jefferson commenced a declaratory judgment action to determine which policy should provide coverage.[7] On cross motions for summary judgment, a Superior Court judge ruled for National, holding that Jefferson's E & O policy provided "complete and exclusive coverage" for the claims asserted in the underlying complaint. We conclude that National's CGL policy provided concurrent coverage for the delay in responding to the emergency call.[8]

The judge initially observed that National's CGL policy itself "unambiguously covers the damages alleged . . . [as a result of the] miscommunication between the dispatcher and the attendants." He nonetheless appears to have reasoned that the ambulance attendants' conduct constituted covered professional activities within the terms of the Jefferson E & O

---

[5]National's CGL policy generally covered damages caused by "occurrences," defined as "accidents," in the course of the insured's "ambulance service" business. "The term 'accident,' . . . commonly is defined as 'an unexpected happening without intention or design,' . . . and may include '[u]nintended or unforeseen consequences of reckless or negligent acts.' " *Liberty Mut. Ins. Co.* v. *Tabor,* 407 Mass. 354, 358 (1990) (citations omitted). National had also sold the insured a "Business Automobile Liability Policy," which Jefferson initially contended provided coverage but has not so argued on appeal.

[6]National asserted before this court that Jefferson had not informed it of the underlying claims or demanded its defense-settlement participation. This assertion is belied by the statement of agreed facts on cross motions for summary judgment and by the trial judge's finding regarding National's refusal to provide or contribute to the defense or settlement of the matter.

[7]Jefferson sought a declaration either that its E & O policy did not provide coverage while National's CGL policy did, or, alternatively, that, if its policy applied, National's provided concurrent coverage. On appeal, Jefferson has argued only for the alternative relief, effectively requiring National to pay its pro rata share of the defense and settlement.

[8]Jefferson does not here dispute the judge's ruling that its E & O policy "unambiguously covers the damages alleged in the underlying complaint, regardless of whether it was the dispatcher [or] the attendants . . . whose actions or omissions caused those damages."

policy[9] and, perforce, was not covered by National's CGL policy because of its professional services exclusion. The judge, we hold, construed the professional services exclusion too expansively, particularly in the context of a general liability policy.

Despite National's unsupported contention to the contrary, the critical, but undefined, term "professional services" in National's CGL policy is ambiguous and requires our construction because it is "reasonably susceptible to varying readings." *Middlesex Ins. Co.* v. *American Employers Ins. Co.*, 9 Mass. App. Ct. 855, 856 (1980). See also *Lumbermens Mut. Cas. Co.* v. *Offices Unlimited, Inc.*, 419 Mass. 462, 466 (1995).[10] Although there is no Massachusetts precedent interpreting the professional services exclusion in the context of medical or ambulance services or of a CGL policy, there are several guideposts that persuade us that the dispatcher's and attendants' actions charged as negligent do not constitute the sort of professional services properly falling within that exclusion.

We begin with basic canons of contract construction, which mandate that doubts created by any ambiguous terms in a policy are to be resolved against the insurer (here National) and also require exclusionary clauses to be strictly construed

---

[9]The judge quoted the coverage section of Jefferson's E & O policy that specifically promises to defend and indemnify the insured ambulance company for actions of any "employee in the employee's profession as a Certified Emergency Medical Technician . . . or Ambulance Driver, or Ambulance Attendant." The judge noted that dispatchers were not included among the "professional" employees listed in the E & O policy but deemed that fact not subversive of his ruling that Jefferson's policy alone provided coverage, on the grounds that a Jefferson underwriting manager conceded (in deposition) that the E & O policy covered any employee acting within the scope of his duties and that the essential injury alleged in the complaint arose out of the failure to render (timely) emergency care services, whatever the reason (dispatcher mistransmission or attendant misunderstanding) for that failure.

[10]Construing the language of an insurance contract generally, interpreting ambiguities in such a contract (when there is no dispute as to underlying facts), and interpreting the scope of any exclusion in an insurance contract are all questions of law for the court, subject to plenary review on appeal. See *Ober* v. *National Cas. Co.*, 318 Mass. 27, 30 (1945); *Cody* v. *Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 146 (1982); *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. 318, 323-324 (1991).

against the insurer.[11] See *Liquor Liab. Joint Underwriting Assn.* v. *Hermitage Ins. Co.*, 419 Mass. 316, 322 (1995); *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. 318, 324 (1991), and cases cited. Application of those canons and the test of common sense, see *Roe* v. *Federal Ins. Co.*, 412 Mass. 43, 49 (1992), cast doubt on the proposition that misreading or misstating an address or driving to the wrong location constituted a professional service, even on the part of an acknowledged professional. Cf. *Camp Dresser & McKee, Inc., supra* at 323 (it is the actual substance of the conduct under scrutiny, not the formal title or position of those involved, that provides the crucial framework for determining the scope of the professional services exclusion).

Two recent Massachusetts decisions addressing the undefined term "professional services" in different insurance contexts provide additional guidance. *Camp Dresser & McKee, Inc.* v. *Home Ins. Co., supra*, involved the issue whether the failure, by an insured consulting company supervising a municipal project, to warn municipal employees working on the project of certain job hazards was within a CGL policy that contained an exclusion for damages "arising out of the rendering or failure to render any professional services." *Id.* at 320. In applying the above-mentioned interpretive principles, this court viewed the allegedly actionable activities as "management tasks" of a nonprofessional nature, *id.* at 324-325, and construed the exclusion to encompass only "purely professional activities," *id.* at 325, involving an "occupation [that] requires specialized knowledge and calls for mental rather than physical skills." *Id.* at 324.

Further clarification was provided in *Roe* v. *Federal Ins. Co., supra*, which concerned the issue whether a dental malpractice policy promising to pay for injuries "arising out of the rendering or failure to render . . . professional services" covered damages occasioned by a dentist's improper sexual relationship with a patient. In the course of holding that it

---

[11]These principles apply even in litigation between presumptively sophisticated insurers, so long as the policy being construed is one issued to a noninsurance company. See *Middlesex Ins. Co.* v. *American Employers Ins. Co.*, 9 Mass. App. Ct. at 856. Contrast *Boston Ins. Co.* v. *Fawcett*, 357 Mass. 535, 543 (1970) (the liberal principles of construction against an insurer do not apply to disputes over contracts of *reinsurance*, where all the parties to the litigation are themselves large insurance companies).

did not, the Supreme Judicial Court expatiated on the term "professional services":

> " 'Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual . . . . In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself.'[12] . . . [M]embership in a profession has traditionally been recognized as requiring the possession of special learning acquired through considerable rigorous intellectual training . . . .'[T]he scope of professional services does not include all forms of a medical professional's conduct simply because he or she is a doctor or dentist' . . . [A]n act or service that requires no professional skill [is not a professional service]. Common sense, of course, will always provide a useful guide in differentiating covered from uncovered cases."

412 Mass. at 48-49 (citations omitted).

It is significant that the court's holding — that the injurious acts for which coverage was sought were not properly characterized as, and did not fall within the category of, professional services — was reached in the context of determining whether an ambiguous policy provision *provided* coverage. In such an inquiry, the provision in question is to

---

[12]These statements were approvingly quoted by the court from *Marx* v. *Hartford Acc. & Indem. Co.*, 183 Neb. 12, 13-14 (1968), and were observed by the court to have "been widely accepted." *Roe, supra* at 48.

be construed in favor of the insured and coverage. See *Charles Dowd Box Co.* v. *Fireman's Fund Ins. Co.*, 351 Mass. 113, 119-120 (1966); *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 700 (1990). Even when thus interpreting the term "professional services" liberally against the insurer, the court would not extend coverage to conduct by a professional that was not an integral part of the specific treatment regimens ordinarily involved in the application of the relevant professional skills.[13] The scope of the term "professional services" in the context of an *exclusion* in an ambulance policy should not be, under the *Camp Dresser-Roe* analysis, any broader. That is, the term should encompass conduct constituting emergency medical treatment and the related exercise of professional judgment, but should not apply to incidents involving ordinary tasks performed or achievable by those lacking the relevant professional training and expertise.

That, indeed, has been the conclusion in many cases from other jurisdictions that have construed professional services exclusions in insurance policies otherwise providing coverage for damages from negligent acts. See, e.g., *Keepes* v. *Doctors Convalescent Center, Inc.*, 89 Ill. App. 2d 36, 40 (1967) (maid negligently leaving young child unattended on floor did not constitute the failure to render professional services); *Grant* v. *Touro Infirmary*, 254 La. 204, 217-219 (1969) (miscounting sponges after a surgery not a professional service); *D'Antoni* v. *Sara Mayo Hosp.*, 144 So. 2d 643, 646-647 (La. Ct. App. 1962) (negligent failure to raise hospital bed rails not a professional service); *Duke Univ.* v. *St. Paul Fire & Marine Ins. Co.*, 96 N.C. App. 635, 641 (1990) (negligent failure to lock casters on a dialysis chair not within the term "professional services").

Perhaps most instructive in this regard is *Guaranty Natl. Ins. Co.* v. *North River Ins. Co.*, 909 F.2d 133 (5th Cir. 1990). There, a psychiatric patient was placed in an "open" fourth floor room (one without mesh screens affixed over the windows) and jumped through a window to her death. The

[13]The court observed that a "dentist's area of professional work involve[s] the patient's teeth," *Roe, supra* at 50; and that a dentist's "professional services . . . [comprise] the cleaning and examination of teeth, the replacement of fillings, the extraction of a tooth, and appropriate follow-up care . . . ." *Roe, supra* at 49.

hospital, sued for negligence, had several liability policies, including a CGL policy from North River and a professional liability policy from another company which agreed to provide coverage to the policy limit. North River refused to pay anything, "claiming that the professional services exclusion in the comprehensive general liability policy excluded any coverage." *Id.* at 135. The Court of Appeals, however, ruled that the exclusion applied only to "actions taken on behalf of a patient that are based on professional, medical judgment," *ibid.*, and that "[t]he decision to protect the open unit patients through screws in the window sashes rather than through fixed, protective screens over the windows was an administrative, business decision and was not a professional, medical decision." *Id.* at 136.

In supportive contrast, where the negligent conduct alleged to trigger coverage did involve specialized knowledge and skills, courts elsewhere have found the professional services exclusion to apply. See, e.g., *Alpha Therapeutic Corp.* v. *St. Paul Fire & Marine Ins. Co.*, 890 F.2d 368, 370-371 (11th Cir. 1989) (exclusion applies to error by medical technician in transcribing medical test results because such activity involves some degree of technical expertise); *Northern Ins. Co.* v. *Superior Ct.*, 91 Cal. App. 3d 541, 544 (1979) (exclusion applies to error by physician's clerical employee in confusing patients' records and causing physician to operate on wrong patient, as it "is beyond dispute that a physician has the professional duty to correctly identify a surgical patient before undertaking a particular procedure"); *Millers Cas. Ins. Co.* v. *Flores*, 117 N.M. 712, 716 (1994) (exclusion in physician's business liability policy applies to unsupervised and untrained physician assistant's giving patient "contraindicated injection," which resulted in a stroke, as the hiring and supervision of employees assisting in providing medical care to patients was part of the rendering of professional medical services); *Duncanville Diagnostic Center, Inc.* v. *Atlantic Lloyd's Ins. Co.*, 875 S.W.2d 788, 791 (Tex. Ct. App. 1994) (exclusion applies to administering overdose of sedative by technician).

Applying the canons of construction, the discussions in *Roe* and *Camp Dresser*, and the analytical approach reflected in other jurisdictions to the underlying facts here, we conclude that the negligent conduct complained of did not constitute

professional services.[14] It was rather in the nature of nonspecialized, clerical or administrative activity requiring neither special learning, intellectual skill, nor professional judgment. Nothing in the record suggests that specialized training, skill, or knowledge, beyond the normal intelligence of the ordinary prudent person, is required: to receive messages from the police, to relay those messages or otherwise supply ambulances with the information necessary for emergency medical technicians to render emergency services, to follow directions, or to locate and drive to specified addresses. To the contrary, ordinary experience and common sense, see *Roe, supra* at 49, indicate that such activities require only the everyday, practical abilities of the average adult, not the art of the adept.[15]

Indeed, to rule otherwise — particularly in the context of a CGL policy generally intended and expected to provide broad liability coverage for tort claims arising out of the insured's entire business and administrative operations, cf. *Trustees of Tufts Univ.* v. *Commercial Union Ins. Co.*, 415 Mass. 844, 847-849 (1993); *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. at 319-321, 323[16] — would produce an anomalous result. If the conduct here at issue were construed as falling within the professional services exclusion,

[14]The summary judgment record does not clarify whether the chargeable fault was the dispatcher's failure to supply the correct address, or the ambulance driver's failure to hear or understand the exact street name supplied, or the ambulance attendant's incomplete examination of the map book, or both emergency medical technicians' failure to verify the correct address when a complete examination would have revealed the ambiguity. This uncertainty is, however, immaterial, because none of those scenarios can, under the proper analysis outlined above and discussed below, be deemed professional.

[15]We note that, in *Curtis Ambulance of Fla., Inc.* v. *Board of County Commrs.*, 811 F.2d 1371 (10th Cir. 1987), "ambulance services" were deemed "professional services" in the context of a public bidding statute. The court focused, however, on the specified substantive duties of the emergency medical technicians staffing the ambulances. *Id.* at 1382. There is no dispute that the lifesaving skills of an emergency medical technician require specialized training and knowledge and would, had they constituted the challenged negligent conduct here, clearly have fallen within the professional services exclusion.

[16]It will be recalled (see note 9, *supra*) that the Superior Court judge observed that the National CGL policy "unambiguously covers the damages alleged in the underlying complaint" prior to ruling that the professional services exclusion took away what the basic policy gave.

there would be few actions of ambulance employees that would be covered, for virtually all of the ordinary activities of ambulance company personnel could be deemed professional in the broad, general sense.[17] Such an interpretation "would have the exclusion swallow the policy," *id.* at 323, and cannot be endorsed. Cf. *Liberty Mut. Ins. Co.* v. *Tabor*, 407 Mass. 354, 358 (1990) ("A provision in an insurance policy that negates the very coverage that the policy purports to provide . . . is void as against public policy").[18]

Since the judge ruled that there was no concurrent coverage, he did not reach the additional point Jefferson presses on appeal, that National was in breach of its duty to defend the insured ambulance company.[19] In light of our discussion of the professional services exclusion, we need pause only briefly to note our agreement with Jefferson. The judge himself read the National CGL policy, sans exclusion, as "unambiguously cover[ing] the damages alleged in the underlying complaint." Under the applicable test, a duty to defend arose on National's part because the allegations of the complaint showed at least a possibility of coverage under its CGL policy. *Sterilite Corp.* v. *Continental Cas. Co.*, 17 Mass. App. Ct. 316, 318-319, 323-324 (1983). See *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. at 321-322. That possibility could not reasonably be deemed wholly extinguished by an ambiguous exclusionary clause which National should have been aware would be strictly construed against it. See *id.* at 323 & n.4,

---

[17]National in fact argues that any activities or operations that are "necessary and incidental to the operation of an ambulance service" are "professional" in nature and therefore covered by Jefferson's policy but excluded from National's.

[18]With a reasonably narrow reading of the professional services exclusion, the two policies at issue can be seen to complement each other and dovetail in most circumstances — the CGL policy providing general liability coverage except for medical treatment given by ambulance employees, which is covered by the E & O policy — with an occasional overlap in circumstances such as the present. See note 9, *supra*. The insured's automobile liability policy with National, see note 5, *supra*, completes the picture, providing coverage for accidents arising out of the ownership, maintenance, and use of the ambulances, including their loading and unloading.

[19]National's assertion that Jefferson raised National's breach of its duty to defend for the first time on appeal is incorrect. The issue was reflected in both the statements of agreed facts and was specifically addressed in Jefferson's memorandum in support of its motion for summary judgment.

324-325. Contrast, e.g., *Timpson* v. *Transamerica Ins. Co.*, 41 Mass. App. Ct. 344, 350-353 (1996) (no duty to defend when the underlying complaint alleges only intentional conduct and the policy explicitly excludes intentional conduct from coverage).

Charged with a contractual duty to defend because its policy provided coverage in the underlying action,[20] National incurred liability for the reasonable costs of both defense and settlement. See *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. at 325-326. Compare *Polaroid* v. *Travelers Indem. Co.*, 414 Mass. 747, 761, 763-765 (1993). We agree with Jefferson that the extent of National's liability in this case is one-half of those costs. An insurer who unjustifiably refuses or fails to defend its insured, even in good faith, assumes the consequential risks of that breach of its insurance contract, including liability for the expense of a reasonable settlement of the underlying claim as well as the cost of the defense to that time. See *Berke Moore Co.* v. *Lumbermens Mut. Cas. Co.*, 345 Mass. 66, 70-71 (1962); *Polaroid Corp.* v. *Travelers Indem. Co.*, 414 Mass. at 762-764. We conclude that, when two policies issued by different insurers arguably cover at least some, if not all, of the settled claims, the defense-defaulting insurer bears the burden of establishing that the allocation of those costs should be other than per capita. See *Liquor Liab. Joint Underwriting Assn.* v. *Hermitage Ins. Co.*, 419 Mass. at 323-324 & n.6. See also *Kenner* v. *Century Indem. Co.*, 320 Mass. 6, 14-15 (1946); *Travelers Ins. Co.* v. *Aetna Ins. Co.*, 359 Mass. 743 (1971); *Mission Ins. Co.* v. *United States Fire Ins. Co.*, 401 Mass. 492, 498-501 (1988). See generally *Federal Ins. Co.* v. *Cablevision Sys. Dev. Co.*, 836 F.2d 54, 56-58 (2d Cir. 1987); *Twin City Fire Ins. Co.* v. *Home Indem. Co.*, 650 F. Supp. 785 (E.D. Pa. 1986); *Continental Cas. Co.* v. *Zurich Ins. Co.*, 57 Cal. 2d 27 (1961); 8A Appleman, Insurance Law and Practice § 4907.65, at

---

[20]National could always have participated in the defense of the underlying action under a reservation of rights. See *Liquor Liab. Joint Underwriting Assn.* v. *Hermitage Ins. Co.*, 419 Mass. at 323; *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. at 323 n.4.

367-369 (rev. ed. 1981). National has wholly failed to satisfy that burden here.[21]

The judgment is vacated. The case is remanded to the Superior Court for entry of: (a) a declaratory judgment that National's CGL policy provided concurrent coverage of the underlying claim and required National to participate with Jefferson in the defense and settlement of that claim; and (b) summary judgment in favor of Jefferson requiring National to contribute and indemnify Jefferson for one-half of the reasonable costs of the defense and settlement of the underlying action.

*So ordered.*

---

[21]Each of the relevant policies in this case contains an "other insurance" clause. Such clauses are generally construed to require apportionment of defense costs among coinsurers on a pro rata basis in proportion to each policy's limit vis-à-vis the aggregate limit of all available policies. See *Mission Ins. Co.* v. *United States Fire Ins. Co.*, 401 Mass. at 495 n.3.; 8A Appleman, Insurance Law and Practice § 4906 at 345-350 (rev. ed. 1981). This is the so-called "majority rule" of allocation of costs in concurrent coverage cases. See *Continental Cas. Co.* v. *Aetna Cas. & Sur. Co.*, 823 F.2d 708, 712 (2d Cir. 1987). Application of that rule would not change the result here because each policy contained liability limits of $500,000 per claim or occurrence and $500,000 aggregate.