**MEDICAL RECORDS ASSOCIATES,
INC., Plaintiff, Appellant,**

v.

**AMERICAN EMPIRE SURPLUS LINES
INSURANCE COMPANY,
Defendant, Appellee.**

No. 97–2145.

United States Court of Appeals,
First Circuit.

Heard March 3, 1998.

Decided April 30, 1998.

Thomas C. Regan for appellant.

James F. Kavanaugh, Jr. with whom James Gray Wagner was on brief for appellee.

Before LYNCH, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

■ This diversity case requires us to determine whether setting fees for copies of medical records is, under Massachusetts law, part of the "professional service" provided by a medical records processing company, thus putting it within the coverage of a professional errors and omissions insurance policy. The appellee, American Empire Surplus Lines Insurance Co. (American Empire), refused to defend and indemnify the appellant, Medical Records Associates, Inc. (MRA), in connection with a claim of overcharging. The district court concluded that the insurer acted properly because its policy does not cover billing practices. We agree, and therefore affirm the dismissal of Medical Records' case.

## I. *Background*

Appellant MRA is a medical records processing business. It contracts with Massachusetts hospitals and medical centers to carry out the medical facilities' statutory ob-

ligation to provide patients or their attorneys with copies of the patients' medical records upon request. *See* Mass. Gen. L. ch. 111, §§ 70, 70E(g). MRA charges a fee, which is paid by the recipient of the records.

In August 1993, MRA received a demand letter on behalf of the law firm Lubin & Meyer, P.C., and others similarly situated, claiming that MRA had overcharged for copies and also may have included improper charges on its bills, in violation of Mass. Gen. L. ch. 93A and other state statutes. MRA referred the claim to American Empire, with whom it had an errors & omissions (E & O) policy providing defense and indemnification for claims based on the company's professional activities. American Empire declined coverage based on several policy exclusions, and MRA thereafter settled the case for an unspecified sum. The company then demanded that American Empire reimburse attorney's fees and settlement costs, but the insurer again refused. This breach of contract action followed.

■ The district court concluded that the Lubin & Meyer claim fell outside the coverage provided by the American Empire policy because the alleged overbilling was not part of MRA's professional service as a medical records processing company. It viewed billing as a "ministerial act," or "routine aftereffect," associated with, but not part of, the professional service performed by MRA. It therefore granted American Empire's motion to dismiss the complaint. MRA subsequently filed this appeal. Our review of a grant of dismissal is plenary. *See Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 16 (1st Cir.1998).

## II. *Discussion*

■ A professional errors and omissions insurance policy provides limited coverage, usually as a supplement to a general comprehensive liability (CGL) policy,[1] for conduct undertaken in performing or rendering professional acts or services. *See, e.g., Jefferson Ins. Co. v. National Union Fire Ins. Co.*, 42

1. Such a supplement is necessary because CGL policies often include a professional services *exclusion. See Jefferson Ins. Co. v. National Union*

*Fire Ins. Co.*, 42 Mass.App. 94, 96, 677 N.E.2d 225, 227 (1997).

Mass.App. 94, 677 N.E.2d 225 (1997); *American Int'l Bank v. Fidelity & Deposit Co.*, 49 Cal.App.4th 1558, 1574, 57 Cal.Rptr.2d 567 (1996) ("the insurer who issues a policy for errors and omissions insures against a far different risk than that insured against" under a comprehensive general liability policy). *See also* J. Appleman, 7A Insurance Law and Practice § 4504.01, at 310 (1979) ("An errors-and-omissions policy is professional-liability insurance providing a specialized and limited type of coverage as compared to comprehensive insurance . . .") Whether the American Empire policy provides coverage is determined by comparing the allegations of the underlying claim—in this case, those contained in the Lubin & Meyer demand letter—with the policy provisions. *See Sterilite Corp. v. Continental Cas. Co.*, 17 Mass.App. 316, 318, 458 N.E.2d 338, 340 (1983). The duty to defend arises if those allegations are "reasonably susceptible" of an interpretation that they state a covered claim, *see id.*, but there is no duty to defend or indemnify if the allegations fall "expressly outside" the policy provisions, *see Timpson v. Transamerica Ins. Co.*, 41 Mass.App. 344, 347, 669 N.E.2d 1092, 1095 (1996).

The policy at issue here states that American Empire's duty to defend attaches when a suit alleges "damages from, or connected with negligent acts, errors, omissions" within the scope of the policy's coverage. The nature of the insurance afforded by the policy is described in the indemnity provision, which states that the insurer will cover:

> Loss which the Insured shall become legally obligated to pay . . . by reason of any actual or alleged negligent act, error or omission committed in the rendering or failure to render the Professional Services stated in the Declarations.

The Declarations attachment identifies the professional services as "Medical Records Processor," but contains no elaboration of that term.

The policy thus requires American Empire to provide a defense and coverage for any claim that MRA improperly "render[ed] or fail[ed] to render the Professional Services" of a medical records processor. The question for us is whether the conduct that is the subject of the demand letter—fee-setting and billing—is among those services. Guided by the relevant cases and, as the caselaw directs, "ordinary experience and common sense," *see Jefferson Ins.*, 42 Mass.App. at 102, 677 N.E.2d at 231 (citing *Roe v. Federal Ins. Co.*, 412 Mass. 43, 49, 587 N.E.2d 214, 217 (1992)), we conclude that it is not.

■ A widely accepted description of the coverage provided by a professional E & O policy, framed by the Nebraska Supreme Court and endorsed repeatedly by Massachusetts courts, limits the scope of such policies to activity involving "specialized" knowledge or skill:

> The term "professional" in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. . . . In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself.

*Marx v. Hartford Acc. & Indem. Co.*, 183 Neb. 12, 13, 157 N.W.2d 870, 872 (1968), *quoted in Roe*, 412 Mass. at 48, 587 N.E.2d at 217 (noting that this standard has been "widely accepted"). Thus, even tasks performed by a professional are not covered if they are "ordinary" activities "achievable by those lacking the relevant professional training and expertise," *Jefferson Ins.*, 42 Mass. App. at 100, 677 N.E.2d at 230.

In *Jefferson Ins.*, the alleged negligent conduct involved delay by the insured company's ambulance in responding to a medical emergency. The court concluded that the basis for the delay—miscommunication between the ambulance company's radio dispatcher and the ambulance attendants about an address—did not constitute professional services. The court explained:

It was rather in the nature of nonspecialized, clerical or administrative activity requiring neither special learning, intellectual skill, nor professional judgment. Nothing in the record suggests that specialized training, skill, or knowledge, beyond the normal intelligence of the ordinary prudent person, is required: to receive messages from the police, to relay those messages or otherwise supply ambulances with the information necessary for emergency medical technicians to render emergency services, to follow directions, or to locate and drive to specified addresses. To the contrary, ordinary experience and common sense ... indicate that such activities require only the everyday, practical abilities of the average adult, not the art of the adept.

*Id.* at 102, 677 N.E.2d at 231. In another of the few Massachusetts cases tackling the "professional services" issue, *Camp Dresser & McKee, Inc. v. Home Ins. Co.*, 30 Mass. App. 318, 324–25, 568 N.E.2d 631, 635 (1991), the inquiry concerned the failure of a consulting company to warn employees working on a project of certain job hazards. In deciding that an exclusion in a CGL policy for damages arising out of professional services did not apply, the court concluded that the challenged activities properly were viewed as "management tasks" of a nonprofessional nature. In *Roe,* too, application of the *Marx* standard led to a holding that the challenged conduct was nonprofessional; a dental malpractice policy was found inapplicable to damages caused by a dentist's improper sexual relationship with a patient. 412 Mass. at 49, 587 N.E.2d at 218.[2]

These cases do not paint an unwavering line of demarcation between "professional" and "nonprofessional" activities. While the conduct in *Roe* was entirely outside the provision of dental services, in both *Jefferson* and *Camp Dresser,* the alleged negligence occurred during the performance—or nonperformance—of tasks that are "inherent in the practice of the insured's profession," *see USM Corp. v. First State Ins. Co.,* 420 Mass.

865, 867, 652 N.E.2d 613, 614 (1995). In those cases, it was the unskilled nature of the specific task—not the absence of a professional endeavor—that rendered the professional services exclusion inapplicable. It is perhaps of some significance that the latter two cases involved *exclusions* to CGL policies—removing professional services from the policies' otherwise comprehensive coverage—rather than professional E & O policies, in light of the well established canon that insurance policies are to be construed in favor of the insured, *see Hazen Paper Co. v. United States Fid. & Guar. Co.,* 407 Mass. 689, 700, 555 N.E.2d 576, 583 (1990); *Charles Dowd Box Co. v. Fireman's Fund Ins. Co.,* 351 Mass. 113, 119–20, 218 N.E.2d 64, 68 (1966). A court applying that maxim might well be inclined to find certain conduct to be both covered by a professional E & O policy but not excluded by a CGL policy's professional liability exclusion.

We think the bottom line, however, is that "professional services" as covered by an E & O policy in Massachusetts embrace those activities that distinguish a particular occupation from other occupations—as evidenced by the need for specialized learning or training—and from the ordinary activities of life and business. In this case, MRA has made a valiant effort to depict its fee-setting activity as an integral part of the service it provides to medical patients and their representatives. Because MRA is required by statute to charge a "reasonable" fee for the copies it provides, and because a high cost for copies could impact the statutorily guaranteed patient access to records, MRA makes the argument that billing is a crucial component of its professional activity—distinguishing it in that respect from other types of businesses.

Accepting the premise that MRA's billing practices are distinctively important because of the public policy concerns reflected by the state laws governing them does not, however, lead inevitably to the conclusion that they fall within the category of professional services. Simply because a task is regulated does not make it "professional." And, while knowing

2. The court stated: "The dentist's area of professional work involved the patient's teeth, and it is obvious that the patient's dental treatment did

not require any of the acts that occurred." 412 Mass. at 50, 587 N.E.2d at 218.

how to access a patient's file, determining whether a medical file is complete, and judging who is a proper recipient of medical records are activities that reasonably may be viewed to require particularized knowledge, we fail to see how setting a price for photocopies and producing accurate invoices are other than generic business practices.[3]

In addition, at oral argument on appeal, MRA acknowledged that the hospitals could have chosen to meet their statutory obligation of providing access to patient records by paying Medical Records directly, rather than imposing the cost on the requestors. And, before the district court, Medical Records conceded that "it could retrieve, copy and provide medical records without billing for the service." These assertions reinforce our view that the billing is most sensibly seen as either a separate service provided by Medical Records for the hospitals or, as the district court found, an incidental part of the business—but not the profession—of medical records processing. As in most other businesses, the bill is an effect of the service provided, not part of the service itself.

MRA suggests that characterizing the fee-setting component of its business as nonprofessional, because it does not satisfy the standard of "special learning acquired through considerable rigorous intellectual training," see *Roe*, 412 Mass. at 49, 587 N.E.2d at 217, would lead to exclusion of all of its services since any error committed by MRA could be traced to a ministerial act, *e.g.*, searching the wrong hospital's records, omitting an important report from a medical record, or retrieving the wrong patient's file. The upshot, says MRA, is that a professional E & O policy such as the one it paid for would be worthless to a medical records business.

We disagree that classifying some of MRA's work as nonprofessional would cast all of it into that category. For example, in an age when privacy concerns are fundamental, judgments about who may have access to medical information are both significant and, it seems to us, not always easily made. The ability to make such decisions arguably depends on "special learning" and "intellectual skill," and the risks associated with release of records to unauthorized individuals appear substantial. Even if some aspects of record-processing, such as the copying of files or setting of fees, are deemed ministerial or "ordinary," that characterization does not negate the professional nature of its core functions.

Also unavailing is MRA's reliance on two attorney's fee cases, *Continental Cas. Co. v. Cole*, 809 F.2d 891 (D.C.Cir.1987), and *Lyons v. American Home Assur. Co.*, 354 N.W.2d 892 (Minn.App.1984), neither of which involved a dispute over the amount charged for a professional service. In *Cole*, a referring attorney filed suit for breach of contract and fiduciary duty against a law firm that had not, as promised, obtained his consent to a settlement, and did not share the fees it received. In *Lyons*, partners of a lawyer, Lyons, sued, *inter alia*, for breach of fiduciary duty when Lyons forewent, without consulting them, a one-third contingency fee in favor of a smaller amount. Both cases, therefore, were attorney vs. attorney actions involving judgments in dealing with clients, not client disputes centering on the administrative procedures of setting fees or generating invoices.[4]

MRA also relies heavily on *Jefferson Ins. Co.*, 42 Mass.App. at 94, 677 N.E.2d at 225, in which both a CGL insurer and an E & O

---

**3.** Further support for the conclusion that the policy did not include billing or fee-setting among the services for which coverage was provided is found in the policy application itself. The application asked MRA to "[d]escribe in detail the profession and professional services for which coverage is desired." MRA did not include billing or fee-setting in its response. It listed only the hands-on tasks associated with obtaining and providing copies of the medical records themselves: "Process Medical Record requests for Hospitals; Photocopy said records and forward to requestors; Provide other medi-

cal record consultative and management services, as required."

We note that not all of the activities listed would, in fact, qualify as professional services. Photocopying, for example, would quite clearly not satisfy the *Marx* standard.

**4.** The district court distinguished *Cole* and *Lyons* based on their policy language. The policies at issue in those cases provided coverage for claims "arising out of" professional services; the American Empire policy requires that the claimed harm be "by reason of" acts or omissions "com-

insurer claimed the other was responsible for covering their common insured, an ambulance company. The allegedly negligent conduct was the delay in arriving at the home of a stricken individual who later died; the delay, as noted above, resulted from miscommunication of an address. The trial court allocated the loss solely to the E & O insurer, ruling that the CGL policy's professional services exclusion relieved that insurer of responsibility. On appeal, the only issue raised was whether the CGL policy *also* covered the loss. The appeals court held that it did, concluding that "the negligent conduct complained of did not constitute professional services," *id.* at 101–102, 677 N.E.2d at 230–31, and thus was not within the professional liability exclusion. Because there was no appeal from the ruling that the exclusion for professional services applied, the odd result was that both insurers were held liable.

MRA argues that *Jefferson* supports its position because the professional liability policy there was deemed applicable even though the alleged negligent conduct did not involve medical services or any activity or treatment typically thought of as "professional." Other than at that superficial level, however, *Jefferson* provides little support for MRA. First, the appeals court never considered whether the E & O policy provided coverage for the dispatcher/driver miscommunication, as the E & O insurer's liability was not challenged on appeal. Second, although the appeals court did explicitly recognize that the two policies overlapped in coverage in the circumstances of that case, *see id.* at 103 n. 18, 677 N.E.2d at 231 n. 18, it did not interpret the E & O policy. Rather, it noted the trial judge's reliance on deposition testimony from the E & O insurer's underwriting manager that the policy covered "any employee acting within the scope of his duties," and the judge's view that "the essential injury alleged in the com-

plaint arose out of the failure to render (timely) emergency care services." *Id.* at 97 n. 9, 677 N.E.2d at 228 n. 9. The E & O insurer's concession of coverage therefore played a significant role in *Jefferson*.

Third, on the continuum of professional services, we think an ambulance company's failure to find the correct address quickly is much closer to the core of the emergency care profession than fee-setting is to the central function of the medical records profession. Indeed, setting a price for services and sending bills are functions of every business, and not ones inherent in the processing of medical records.

In sum, we are persuaded that the district court properly found that the allegedly improper conduct challenged in the Lubin & Meyer letter is not within the coverage of MRA's E & O policy. The judgment of the district court is therefore *AFFIRMED*.

---

mitted in the rendering or failure to render the Professional Services." It is a closer question whether the asserted injury here "arose out of" MRA's professional records processing service than whether it was "by reason of" the professional service. The latter arguably requires a determination that the harm alleged was due to the manner in which professional services were provided; the former appears to require only a connection between the challenged conduct and the insured's provision of professional services.

*See New England Mut. Life Ins. Co. v. Liberty Mut. Ins. Co.,* 40 Mass.App. 722, 726, 667 N.E.2d 295, 298 (1996) ("The usual meaning ascribed to the phrase 'arising out of' is much broader than 'caused by'...."). As the policy here employs the narrower language, and MRA does not argue that that language provides coverage for conduct other than professional services, the difference in the formulations is of no consequence to our decision.