USCA1 Opinion

 

United States Court of Appeals
For the First Circuit
 No. 97-2145

 MEDICAL RECORDS ASSOCIATES, INC.,

 Plaintiff, Appellant,

 v.

 AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY,

 Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Richard Stearns, U.S. District Judge]

 Before

 Lynch, Circuit Judge,
Coffin and Bownes, Senior Circuit Judges.

 Thomas C. Regan for appellant.
 James F. Kavanaugh, Jr. with whom James Gray Wagner was on brief for appellee.

April 30, 1998

 COFFIN, Senior Circuit Judge. This diversity case requires us
to determine whether setting fees for copies of medical records is,
under Massachusetts law, part of the "professional service"
provided by a medical records processing company, thus putting it
within the coverage of a professional errors and omissions
insurance policy. The appellee, American Empire Surplus Lines
Insurance Co. (American Empire), refused to defend and indemnify
the appellant, Medical Records Associates, Inc. (MRA), in
connection with a claim of overcharging. The district court
concluded that the insurer acted properly because its policy does
not cover billing practices. We agree, and therefore affirm the
dismissal of Medical Records' case.
 I. Background
 Appellant MRA is a medical records processing business. It
contracts with Massachusetts hospitals and medical centers to carry
out the medical facilities' statutory obligation to provide
patients or their attorneys with copies of the patients' medical
records upon request. See Mass. Gen. L. ch. 111, 70, 70E(g). 
MRA charges a fee, which is paid by the recipient of the records. 
 In August 1993, MRA received a demand letter on behalf of the
law firm Lubin & Meyer, P.C., and others similarly situated,
claiming that MRA had overcharged for copies and also may have
included improper charges on its bills, in violation of Mass. Gen.
L. ch. 93A and other state statutes. MRA referred the claim to
American Empire, with whom it had an errors & omissions (E & O)
policy providing defense and indemnification for claims based on
the company's professional activities. American Empire declined
coverage based on several policy exclusions, and MRA thereafter
settled the case for an unspecified sum. The company then demanded
that American Empire reimburse attorney's fees and settlement
costs, but the insurer again refused. This breach of contract
action followed.
 The district court concluded that the Lubin & Meyer claim fell
outside the coverage provided by the American Empire policy because
the alleged overbilling was not part of MRA's professional service
as a medical records processing company. It viewed billing as a
"ministerial act," or "routine aftereffect," associated with, but
not part of, the professional service performed by MRA. It
therefore granted American Empire's motion to dismiss the
complaint. MRA subsequently filed this appeal. Our review of a
grant of dismissal is plenary. See Beddall v. State Street Bank &
Trust Co., 137 F.3d 12, 16 (1st Cir. 1998).
 II. Discussion
 A professional errors and omissions insurance policy provides
limited coverage, usually as a supplement to a general
comprehensive liability (CGL) policy, for conduct undertaken in
performing or rendering professional acts or services. See, e.g.,
Jefferson Ins. Co. v. National Union Fire Ins. Co., 42 Mass. App.
94, 677 N.E.2d 225 (1997); American Int'l Bank v. Fidelity &
Deposit Co., 49 Cal. App.4th 1558, 1574 (1996) ("the insurer who
issues a policy for errors and omissions insures against a far
different risk than that insured against" under a comprehensive
general liability policy). See also J. Appleman, 7A Insurance Law
and Practice 4504.01, at 310 (1979) ("An errors-and-omissions
policy is professional-liability insurance providing a specialized
and limited type of coverage as compared to comprehensive insurance
. . .") Whether the American Empire policy provides coverage is
determined by comparing the allegations of the underlying claim --
in this case, those contained in the Lubin & Meyer demand letter --
with the policy provisions. See Sterilite Corp. v. Continental
Cas. Co., 17 Mass. App. 316, 318, 458 N.E.2d 338, 340 (1983). The
duty to defend arises if those allegations are "reasonably
susceptible" of an interpretation that they state a covered claim,
see id., but there is no duty to defend or indemnify if the
allegations fall "expressly outside" the policy provisions, seeTimpson v. Transamerica Ins. Co., 41 Mass. App. 344, 347, 669
N.E.2d 1092, 1095 (1996).
 The policy at issue here states that American Empire's duty to
defend attaches when a suit alleges "damages from, or connected
with negligent acts, errors, omissions" within the scope of the
policy's coverage. The nature of the insurance afforded by the
policy is described in the indemnity provision, which states that
the insurer will cover:
 Loss which the Insured shall become legally obligated to
 pay . . . by reason of any actual or alleged negligent
 act, error or omission committed in the rendering or
 failure to render the Professional Services stated in the
 Declarations.

The Declarations attachment identifies the professional services as
"Medical Records Processor," but contains no elaboration of that
term.
 The policy thus requires American Empire to provide a defense
and coverage for any claim that MRA improperly "render[ed] or
fail[ed] to render the Professional Services" of a medical records
processor. The question for us is whether the conduct that is the
subject of the demand letter -- fee-setting and billing -- is among
those services. Guided by the relevant cases and, as the caselaw
directs, "ordinary experience and common sense," see Jefferson
Ins., 42 Mass. App. at 102, 677 N.E.2d at 231 (citing Roe v.
Federal Ins. Co., 412 Mass. 43, 49, 587 N.E.2d 214, 217 (1992)), we
conclude that it is not.
 A widely accepted description of the coverage provided by a
professional E & O policy, framed by the Nebraska Supreme Court and
endorsed repeatedly by Massachusetts courts, limits the scope of
such policies to activity involving "specialized" knowledge or
skill:
 The term "professional" in the context used in the policy
 provision means something more than mere proficiency in
 the performance of a task and implies intellectual skill
 as contrasted with that used in an occupation for
 production or sale of commodities. A "professional" act
 or service is one arising out of a vocation, calling,
 occupation, or employment involving specialized
 knowledge, labor, or skill, and the labor or skill
 involved is predominantly mental or intellectual, rather
 than physical or manual . . . . In determining whether a
 particular act is of a professional nature or a
 "professional service" we must look not to the title or
 character of the party performing the act, but to the act
 itself.

Marx v. Hartford Acc. & Indem. Co., 183 Neb. 12, 13, 157 N.W.2d
870, 872 (1968), quoted in Roe, 412 Mass. at 48, 587 N.E.2d at 217
(noting that this standard has been "widely accepted"). Thus, even
tasks performed by a professional are not covered if they are
"ordinary" activities "achievable by those lacking the relevant
professional training and expertise," Jefferson Ins., 42 Mass. App.
at 100, 677 N.E.2d at 230.
 In Jefferson Ins., the alleged negligent conduct involved
delay by the insured company's ambulance in responding to a medical
emergency. The court concluded that the basis for the delay --
miscommunication between the ambulance company's radio dispatcher
and the ambulance attendants about an address -- did not constitute
professional services. The court explained:
 It was rather in the nature of nonspecialized, clerical
 or administrative activity requiring neither special
 learning, intellectual skill, nor professional judgment. 
 Nothing in the record suggests that specialized training,
 skill, or knowledge, beyond the normal intelligence of
 the ordinary prudent person, is required: to receive
 messages from the police, to relay those messages or
 otherwise supply ambulances with the information
 necessary for emergency medical technicians to render
 emergency services, to follow directions, or to locate
 and drive to specified addresses. To the contrary,
 ordinary experience and common sense . . . indicate that
 such activities require only the everyday, practical
 abilities of the average adult, not the art of the adept.

Id. at 102, 677 N.E.2d at 231. In another of the few Massachusetts
cases tackling the "professional services" issue, Camp Dresser &
McKee, Inc. v. Home Ins. Co., 30 Mass. App. 318, 324-25, 568 N.E.2d
631, 635 (1991), the inquiry concerned the failure of a consulting
company to warn employees working on a project of certain job
hazards. In deciding that an exclusion in a CGL policy for damages
arising out of professional services did not apply, the court
concluded that the challenged activities properly were viewed as
"management tasks" of a nonprofessional nature. In Roe, too,
application of the Marx standard led to a holding that the
challenged conduct was nonprofessional; a dental malpractice policy
was found inapplicable to damages caused by a dentist's improper
sexual relationship with a patient. 412 Mass. at 49, 587 N.E.2d at
218.
 These cases do not paint an unwavering line of demarcation
between "professional" and "nonprofessional" activities. While the
conduct in Roe was entirely outside the provision of dental
services, in both Jefferson and Camp Dresser, the alleged
negligence occurred during the performance -- or non-performance --
of tasks that are "inherent in the practice of the insured's
profession," see USM Corp. v. First State Ins. Co., 420 Mass. 865,
867, 652 N.E.2d 613, 614 (1995). In those cases, it was the
unskilled nature of the specific task -- not the absence of a
professional endeavor -- that rendered the professional services
exclusion inapplicable. It is perhaps of some significance that
the latter two cases involved exclusions to CGL policies --
removing professional services from the policies' otherwise
comprehensive coverage -- rather than professional E & O policies,
in light of the well established canon that insurance policies are
to be construed in favor of the insured, see Hazen Paper Co. v.
United States Fid. & Guar. Co., 407 Mass. 689, 700, 555 NE.2d 576,
583 (1990); Charles Dowd Box Co. v. Fireman's Fund Ins. Co., 351
Mass. 113, 119-20, 218 N.E.2d 64, 68 (1966). A court applying that
maxim might well be inclined to find certain conduct to be both
covered by a professional E & O policy but not excluded by a CGL
policy's professional liability exclusion.
 We think the bottom line, however, is that "professional
services" as covered by an E & O policy in Massachusetts embrace
those activities that distinguish a particular occupation from
other occupations -- as evidenced by the need for specialized
learning or training -- and from the ordinary activities of life
and business. In this case, MRA has made a valiant effort to
depict its fee-setting activity as an integral part of the service
it provides to medical patients and their representatives. Because
MRA is required by statute to charge a "reasonable" fee for the
copies it provides, and because a high cost for copies could impact
the statutorily guaranteed patient access to records, MRA makes the
argument that billing is a crucial component of its professional
activity -- distinguishing it in that respect from other types of
businesses.
 Accepting the premise that MRA's billing practices are
distinctively important because of the public policy concerns
reflected by the state laws governing them does not, however, lead
inevitably to the conclusion that they fall within the category of
professional services. Simply because a task is regulated does not
make it "professional." And, while knowing how to access a
patient's file, determining whether a medical file is complete, and
judging who is a proper recipient of medical records are activities
that reasonably may be viewed to require particularized knowledge,
we fail to see how setting a price for photocopies and producing
accurate invoices are other than generic business practices. 
 In addition, at oral argument on appeal, MRA acknowledged that
the hospitals could have chosen to meet their statutory obligation
of providing access to patient records by paying Medical Records
directly, rather than imposing the cost on the requestors. And,
before the district court, Medical Records conceded that "it could
retrieve, copy and provide medical records without billing for the
service." These assertions reinforce our view that the billing is
most sensibly seen as either a separate service provided by Medical
Records for the hospitals or, as the district court found, an
incidental part of the business -- but not the profession -- of
medical records processing. As in most other businesses, the bill
is an effect of the service provided, not part of the service
itself.
 MRA suggests that characterizing the fee-setting component of
its business as non-professional, because it does not satisfy the
standard of "special learning acquired through considerable
rigorous intellectual training," see Roe, 412 Mass. at 49, 587
N.E.2d at 217, would lead to exclusion of all of its services since
any error committed by MRA could be traced to a ministerial act,
e.g., searching the wrong hospital's records, omitting an important
report from a medical record, or retrieving the wrong patient's
file. The upshot, says MRA, is that a professional E & O policy
such as the one it paid for would be worthless to a medical records
business.
 We disagree that classifying some of MRA's work as
nonprofessional would cast all of it into that category. For
example, in an age when privacy concerns are fundamental, judgments
about who may have access to medical information are both
significant and, it seems to us, not always easily made. The
ability to make such decisions arguably depends on "special
learning" and "intellectual skill," and the risks associated with
release of records to unauthorized individuals appear substantial. 
Even if some aspects of record-processing, such as the copying of
files or setting of fees, are deemed ministerial or "ordinary,"
that characterization does not negate the professional nature of
its core functions.
 Also unavailing is MRA's reliance on two attorney's fee cases,
Continental Cas. Co. v. Cole, 809 F.2d 891 (D.C. Cir. 1987), and
Lyons v. American Home Assur. Co., 354 N.W.2d 892 (Minn. 1984),
neither of which involved a dispute over the amount charged for a
professional service. In Cole, a referring attorney filed suit for
breach of contract and fiduciary duty against a law firm that had
not, as promised, obtained his consent to a settlement, and did not
share the fees it received. In Lyons, partners of a lawyer, Lyons,
sued, inter alia, for breach of fiduciary duty when Lyons forewent,
without consulting them, a one-third contingency fee in favor of a
smaller amount. Both cases, therefore, were attorney vs. attorney
actions involving judgments in dealing with clients, not client
disputes centering on the administrative procedures of setting fees
or generating invoices.
 MRA also relies heavily on Jefferson Ins. Co., 42 Mass. App.
at 94, 677 N.E.2d at 225, in which both a CGL insurer and an E & O
insurer claimed the other was responsible for covering their common
insured, an ambulance company. The allegedly negligent conduct was
the delay in arriving at the home of a stricken individual who
later died; the delay, as noted above, resulted from
miscommunication of an address. The trial court allocated the loss
solely to the E & O insurer, ruling that the CGL policy's
professional services exclusion relieved that insurer of
responsibility. On appeal, the only issue raised was whether the
CGL policy also covered the loss. The appeals court held that it
did, concluding that "the negligent conduct complained of did not
constitute professional services," id. at 101-102, 677 N.E.2d at
230-31, and thus was not within the professional liability
exclusion. Because there was no appeal from the ruling that the
exclusion for professional services applied, the odd result was
that both insurers were held liable.
 MRA argues that Jefferson supports its position because the
professional liability policy there was deemed applicable even
though the alleged negligent conduct did not involve medical
services or any activity or treatment typically thought of as
"professional." Other than at that superficial level, however,
Jefferson provides little support for MRA. First, the appeals
court never considered whether the E & O policy provided coverage
for the dispatcher/driver miscommunication, as the E & O insurer's
liability was not challenged on appeal. Second, although the
appeals court did explicitly recognize that the two policies
overlapped in coverage in the circumstances of that case, see id.at 103 n.18, 677 N.E.2d at 231 n.18, it did not interpret the E &
O policy. Rather, it noted the trial judge's reliance on
deposition testimony from the E & O insurer's underwriting manager
that the policy covered "any employee acting within the scope of
his duties," and the judge's view that "the essential injury
alleged in the complaint arose out of the failure to render
(timely) emergency care services." Id. at 97 n.9, 677 N.E.2d at
228 n.9. The E & O insurer's concession of coverage therefore
played a significant role in Jefferson. 
 Third, on the continuum of professional services, we think an
ambulance company's failure to find the correct address quickly is
much closer to the core of the emergency care profession than fee-
setting is to the central function of the medical records
profession. Indeed, setting a price for services and sending bills
are functions of every business, and not ones inherent in the
processing of medical records.
 In sum, we are persuaded that the district court properly
found that the allegedly improper conduct challenged in the Lubin
& Meyer letter is not within the coverage of MRA's E & O policy. 
The judgment of the district court is therefore AFFIRMED.