**WESTERN WORLD INSURANCE COMPANY, Plaintiff**

v.

**AMERICAN AND FOREIGN INSURANCE COMPANY,** Defendant

**No. CIV. 01–105PDMC.**

United States District Court, D. Maine.

Jan. 14, 2002.

Thomas V. Laprade, Lambert, Coffin, Portland, ME, for Western World Insurance Company, plaintiff.

James D. Poliquin, Norman, Hanson & Detroy, Portland, ME, for American & Foreign Insurance Company, defendant.

### *MEMORANDUM DECISION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT* [1]

DAVID M. COHEN, United States Magistrate Judge.

Plaintiff Western World Insurance Company ("Western World") and defendant American and Foreign Insurance Company ("Royal") cross-move for summary judgment in this action seeking declaratory judgment that Royal possessed duties to defend and indemnify the Town of Brunswick ("Town") in connection with a lawsuit arising from the fatal 1997 shooting of one Richard Weymouth by Brunswick police. Western World Insurance Company's Motion for Summary Judgment, etc. ("Plaintiff's Motion") (Docket No. 8) at 1–2; Defendant American and Foreign Insurance Company's Motion for Summary Judgment, etc. ("Defendant's Motion") (Docket No. 10) at 1–2; Complaint (Docket No. 1) ¶¶ 1, 7–9, 21–23. For the reasons that follow, the Defendant's Motion is granted and the Plaintiff's Motion is denied.

### I. Summary Judgment Standards

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the govern-

ing law if the dispute over it is resolved favorably to the nonmovant .... By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable [factfinder] could resolve the point in favor of the nonmoving party ....'" *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995) (citations omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Cadle Co. v. Hayes,* 116 F.3d 957, 959 (1st Cir.1997). To the extent that parties cross-move for summary judgment, the court must draw all reasonable inferences against granting summary judgment to determine whether there are genuine issues of material fact to be tried. *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.,* 972 F.2d 426, 429 (1st Cir. 1992). If there are any genuine issues of material fact, both motions must be denied as to the affected issue or issues of law; if not, one party is entitled to judgment as a matter of law. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720, at 336–37 (1998).

### II. Factual Context

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Loc. R. 56, reveal the following relevant to this decision:

---

**1.** Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge David M. Cohen conduct all pro-

ceedings in this case, including trial, and to order entry of judgment.

On November 6, 1997 Sergeant Mark Phillips and patrolman Shawn O'Leary of the Brunswick Police Department responded to a disturbance and possible assault at an apartment on 29 High Street involving Weymouth and several of his drinking companions. Western World Insurance Company's Statement of Material Facts with Respect to Which There Is No Genuine Dispute ("Plaintiff's SMF") (Docket No. 9) ¶ 1; American and Foreign Insurance Company's Response to Western World's Statement of Material Facts ("Defendant's Opposing SMF") (Docket No. 21) ¶ 1. Shortly after the officers entered the apartment, Weymouth quickly and without warning withdrew a previously concealed butcher knife with an eight- to ten-inch blade. *Id.* ¶ 2. The officers made several failed attempts to make Weymouth drop the knife without resort to deadly force. *Id.* ¶ 3.

The officers never attempted to use police batons to stop Weymouth because neither had one available, which was alleged to have been in violation of the Town's departmental policy. *Id.* ¶ 4. General Order 95–3, section 3.07, required officers to wear among their "Belts and Equipment" a "Department–Approved Impact Weapon," which no one inspected on the day of the incident. *Id.* ¶ 5. Despite the officers' efforts to stop Weymouth, he repeatedly stabbed himself in the abdomen, moved his wheelchair, ignored the officers and acted in a manner that threatened them. *Id.* ¶ 6. O'Leary shot Weymouth three times. *Id.* ¶ 7.

On or about October 28, 1999 Donna Connors, as personal representative of the estate of Weymouth, initiated a lawsuit against O'Leary, Phillips, chief of police Jerry Hinton and the Town (the "Connors Complaint"). *Id.* ¶¶ 5, 8.[2] The Connors Complaint alleged that the use of deadly force against Weymouth was unreasonable and without justification. Defendant American and Foreign Insurance Company's Statement of Material Facts in Support of Motion for Summary Judgment ("Defendant's SMF") (Docket No. 11) ¶ 9; Western World Insurance Company's Opposition to American and Foreign Insurance Company's Statement of Material Facts ("Plaintiff's Opposing SMF") (Docket No. 23) ¶ 9.

Count I of the Connors Complaint alleged that Phillips and O'Leary used excessive force, violated Weymouth's civil and constitutional rights and caused his death. Defendant's SMF ¶ 10; Connors Complaint, attached as Exh. 7. to Statement of Stipulated Facts ("Stipulated Facts") (Docket No. 7), ¶ 23. Count II asserted a claim against the Town for violation of Weymouth's civil rights, based upon allegations of "failing to adequately train, supervise and discipline its officers." Defendant's SMF ¶¶ 11–12; Plaintiff's Opposing SMF ¶¶ 11–12. Count III alleged assault and battery based upon Phillips' and O'Leary's use of force in attempting to arrest Weymouth. *Id.* ¶ 13. Count IV stated a claim for warrantless arrest and alleged that Phillips and O'Leary attempted to arrest Weymouth without sufficient cause or basis and without having a valid warrant for his arrest. *Id.* ¶ 14. Count V, captioned "Negligence and Wrongful Death," alleged that the officers' assault and battery upon Weymouth in wrongfully attempting to arrest him and in shooting him constituted a breach of the standard of care. *Id.* ¶ 15. Count V also alleged, in paragraph 39: "The actions by all of the Defendants individually and jointly, including the failure to adequately train, supervise and discipline, and including the indi-

---

**2.** The allegations of the Connors Complaint are incorporated in full by reference into Western World's statement of material facts. *See* Plaintiff's SMF ¶ 9.

vidual actions of Defendants Phillips and O'Leary, constitute negligence and wrongful death under Maine law." Plaintiff's SMF ¶ 9; Defendant's Opposing SMF ¶ 9; *see also* Connors Complaint ¶ 39. Count VI of the Connors Complaint sought punitive damages based upon the allegations set forth in paragraphs 1 though 39 of the complaint. Defendant's SMF ¶ 16; Plaintiff's Opposing SMF ¶ 16.

The defendants in the Connors case moved for summary judgment. Plaintiff's SMF ¶ 10; Defendant's Opposing SMF ¶ 10. The plaintiff opposed the motion for summary judgment as to Hinton and the Town on the ground of failure to examine the officers' uniforms for the presence of impact weapons before they went out on the day of the incident. *Id.* ¶ 5. Count I survived against O'Leary for causing harm to Weymouth through the excessive use of force. *Id.* ¶ 10. Count II survived against the Town and Hinton for failure to enforce "official policy requiring the carrying of batons," as required by the dress code. *Id.* ¶ 11. Count V, the claim under state law for "negligence and wrongful death," survived against all of the remaining defendants. *Id.* ¶ 12.

The case settled during trial, resolving each claim that survived summary judgment. *Id.* ¶ 13. The amount of $150,000 paid in settlement, which included the plaintiff's attorneys' fees, was reasonable. *Id.* ¶ 14. Western World paid the reasonable amount of $105,669.50 in attorneys' fees and $16,249.04 in costs to defend the case through the time settlement was concluded. *Id.* ¶ 15.

Royal insured the Town under a standard commercial general liability policy that was in effect at the time of the events at issue in this case. *Id.* ¶ 16. After the Town's insurance agent, the Riley Insurance Agency, sent Royal a copy of the plaintiff's notice of claim, but before the Connors Complaint was filed, Craig Carver of Royal Insurance Company, the parent of American and Foreign Insurance Company, wrote to Hinton stating that his company would not insure the Town or the police department for the claims made in the notice of claim because:

The decision to fire on Mr. Weymouth is considered a professional decision made by a police officer in the line of duty, and therefore an act under the coverage of a professional liability insurance policy. Because the Town carries policies for this purpose, Royal's policy contains a Professional Liability Exclusion that reads, With respect to any professional services shown in the Schedule, this insurance does not apply to 'bodily injury,' 'property damage,' 'personal injury,' or 'advertising injury' due to the rendering or failure to render any professional service.

*Id.* ¶ 17. The "Schedule" to which Carver referred in his letter states:

**Description of Professional Services:**
1. 44102   **ALL PROFESSIONAL LIABILITY SERVICES PROVIDED BY THE TOWN OF BRUNSWICK**

*Id.* ¶ 18.

On October 25, 1999, after having received a copy of a proposed complaint that did not differ from the complaint Connors eventually filed, Royal wrote to Hinton stating in part:

[O]ur position with respect to our involvement in this matter is unchanged. The allegations brought against the Town of Brunswick are related to the training, supervision, and discipline of Town police officers. Our position is that those items all fall within the auspices of a "professional service," and that the exclusionary language cited in Mr. Carver's letter apply [sic].

Defendant's Opposing SMF ¶ 19; Letter dated October 25, 1999 from Kirk W. Purcell, AIC to Town of Brunswick, Attn:

Chief Hinton, attached as Exh. 4 to Stipulated Facts.

Western World insured the Town under a law enforcement liability policy that was in effect at the time of the events at issue in this case. Plaintiff's SMF ¶ 21; Defendant's Opposing SMF ¶ 21. The Western World policy states, among other things:

If other valid and collectible insurance is available to the insured for a loss we cover as a "law enforcement incident", our obligations are limited as follows:

\* \* \* \* \* \*

b. If the other insurance available to you was not issued by us, the insurance available under this policy shall be excess insurance over any other valid and collectible insurance available to the insured.

*Id.* ¶ 22.[3]

## III. Analysis

Western World argues first and foremost that, by electing not to use a narrowly tailored, commonly used law enforcement activity exclusion, Royal signaled (perhaps unwittingly) that no such activities were to be excluded. Plaintiff's Motion at 1–2, 5–6. Alternatively, Western World contends that, even assuming *arguendo* the applicability of Royal's more broadly worded professional services exclusion, Royal possessed duties to defend and to indemnify in the Connors case. *Id.* at 7–9.

For its part, Royal seeks summary judgment on the bases that (i) Western World's primary proposition is without merit; (ii) in this case, the availability of uncontroverted extrinsic evidence obviates the need to resort to "traditional" principles of contract interpretation to determine the

Town's and Royal's intent; and (iii) in any event, even traditional contract analysis yields the conclusion that Royal possessed no duty to defend. Defendant's Motion at 2–11.

Both parties agree that, in this diversity action, Maine law applies. *Id.* at 3; Plaintiff's Motion at 5.

■ I first address Western World's novel argument:

The absence of a Law Enforcement Activity exclusion [of the type assertedly used in commercial general liability policies nationwide] is like the famous watchdog that didn't bark in the night in the Sherlock Holmes story, 'Silver Blaze'—the absence of a bark said more than any sound could have.... In other words, the fact that Royal *has* a professional services exclusion highlights the fact that it *does not have* a law enforcement activity exclusion or the concomitant ability to negate coverage for law enforcement activity.

Plaintiff's Motion at 6 (emphasis in original). For this proposition Western World cites only one case, *Travelers Indem. Co. v. Dingwell*, 414 A.2d 220, 223 (Me.1980), which it says holds that "it is error to read into an expressed coverage exclusion language that is not in the exclusion which would negate coverage." *Id. Dingwell* merely holds that it is error to read into an unambiguous pollution exclusion the words "sudden and accidental." *Dingwell*, 414 A.2d at 223. It makes no pronouncement whatsoever that, as a general proposition, a broadly worded exclusion is ineffective as to specific classes of conduct.

Nor is there any reason to suspect that, if confronted with this question, the Law Court would side with Western World. As

**3.** Western World protests that extrinsic evidence offered by Royal to show the intent of the parties to the Royal contract is immateri-

al. *See* Defendant's SMF ¶¶ 25–42; Plaintiff's Opposing SMF ¶¶ 25–42. I agree, and accordingly disregard that profered evidence.

Royal points out, "[i]mplicit in Western World's position is the notion that there can be only one 'right' way of excluding coverage for law enforcement activities." *See* Objection of American and Foreign Insurance Company to Western World's Motion for Summary Judgment (Docket No. 20) at 3. While it may well be true, as Western World asserts, that courts have found specific exclusions for law enforcement activity effective, *see* Plaintiff's Motion at 5, those cases do not thereby imply that more broadly worded exclusions are ineffective. Nor can Western World identify a single case in which a broadly worded exclusion has been held entirely ineffective—in effect, stricken from the parties' insurance contract—simply because a more specifically worded exclusion could have been used. Such an approach, rather than being consistent with Law Court precedent, would seem an abrupt departure from it. *See, e.g., Apgar v. Commercial Union Ins. Co.,* 683 A.2d 497, 500 (Me. 1996) ("The function of the court is not to make a new contract for the parties by enlarging or diminishing its terms, but is to ascertain the meaning and intention of [the contract] *actually made.*") (citations and internal quotation marks omitted) (emphasis in original). I accordingly decline to embrace this argument.

■ I next address another unusual invitation—this time from Royal—that the court bypass the "traditional" exercise of contract interpretation and proceed directly to Royal's extrinsic evidence to divine the meaning of its professional services exclusion. *See* Defendant's Motion at 6–7. As Western World rightly rejoins, this suggested approach offends cardinal principles of insurance law. *See* Western World Insurance Company's Opposition to American and Foreign Insurance Company's Motion for Summary Judgment ("Plaintiff's Opposition") (Docket No. 19)

at 1–3. In Maine (as elsewhere), courts first examine relevant policy language to determine whether it is unambiguous; if so, it is enforced as written. *See, e.g., Dingwell,* 414 A.2d at 223 ("Unambiguous language in a contract must be given its plain meaning.") (citation omitted). Only if the language is determined to be ambiguous—that is, "reasonably susceptible of different interpretations,"—is extrinsic evidence considered. *Apgar,* 683 A.2d at 498, 501 (citation and internal quotation mark omitted).

■ As Western World points out, Royal never suggests that the language of its professional services exclusion is ambiguous (and, indeed, is in an awkward position to do so). *See* Plaintiff's Opposition at 2–3; Defendant's Motion at 2–7, 10. Nor do I find, for reasons discussed below, that the language in issue is ambiguous. Accordingly, Royal's extrinsic evidence is irrelevant to decision of this case. Nonetheless, Western World seeks to stretch its victory too far in declaring that "[o]nce the Court rejects this evidence, there is nothing left to support [Royal's] motion for summary judgment and it should therefore be denied." *See* Plaintiff's Opposition at 2. Western World makes too short a shrift of Royal's remaining (and as it turns out, meritorious) contention that, even proceeding by way of traditional contract interpretation, Royal should be found not to have had a duty to defend.

■ "It is black letter law in [the state of Maine] that an insurer's duty to defend is determined by comparing the allegations in the underlying complaint with the provisions of the insurance policy." *Foundation for Blood Research v. St. Paul Marine & Fire Ins. Co.,* 730 A.2d 175, 177 (Me.1999). "This is the 'comparison test.' If the underlying complaint discloses a potential or a possibility for liability within

the coverage of the policy, the insurer has a duty to defend." *Id.*

■ The relevant language of the Royal policy provides that "[w]ith respect to any professional services shown in the Schedule"—which are defined as "all professional liability services provided by the Town of Brunswick"—"this insurance does not apply to 'bodily injury,' 'property damage,' 'personal injury,' or 'advertising injury' due to the rendering or failure to render any professional service."

While, as Western World points out, *see* Plaintiff's Motion at 7, the Law Court has not had occasion to address the meaning of a professional services exclusion, I conclude that the term "professional services," as used in the Royal policy, is not ambiguous. As other courts have noted, the line between what constitutes a professional service and what does not is capable of being drawn with some precision. The definition first articulated by the Supreme Court of Nebraska is the most frequently quoted discussion of the issue:

> Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.... In determining whether a particular act is of a professional nature or a "professional service," [the court] must

look not to the title or character of the party performing the act, but to the act itself.

*Marx v. Hartford Accident & Indem. Co.*, 183 Neb. 12, 157 N.W.2d 870, 871–72 (1968) (citations omitted); *accord, e.g.*, *Medical Records Assocs. v. American Empire Surplus Lines Ins. Co.*, 142 F.3d 512, 514 (1st Cir.1998) (construing Massachusetts law); *Harad v. Aetna Cas. & Sur. Co.*, 839 F.2d 979, 984 (3rd Cir.1988); *Bank of California, N.A. v. Opie*, 663 F.2d 977, 981 (9th Cir.1981); *Roe v. Federal Ins. Co.*, 412 Mass. 43, 587 N.E.2d 214, 217 (1992).

■ Western World contends that with respect to all of the defendants (Hinton, O'Leary and Phillips as well as the Town) "there was at least a chance that, as alleged in the complaint, those actions were not professional services, which would be enough to trip the hair trigger of the duty to defend." Plaintiff's Motion at 8. Western World points to paragraph 39 of the Connors Complaint, which states: "The actions by all of the Defendants individually and jointly, including the failure to adequately train, supervise and discipline, and including the individual actions of Defendants Phillips and O'Leary, constitute negligence and wrongful death under Maine law." *Id.; see also* Western World Insurance Company's Reply to Defendant's Opposition to Western World's Motion for Summary Judgment ("Plaintiff's Reply") (Docket No. 28) at 2–3; Connors Complaint ¶ 39. In Western World's view, this paragraph sets forth "general allegations" of negligence inasmuch as (i) it refers to "the actions" of the defendants without specifying which actions; (ii) it employs the word "including," indicating that the allegations are broader than those listed; and (iii) it claims "all of the Defendants" were negligent "individually and jointly," suggesting that the alleged negligence

went beyond issues of training, supervision and discipline. Plaintiff's Reply at 2. According to Western World, in Maine general allegations of negligence suffice to impose a duty to defend. *Id.* at 2–3; *see also* Plaintiff's Motion at 8. Western World finally argues that, in any event, the Town itself was neither a "professional" nor was alleged to have performed any professional acts. Plaintiff's Reply at 3.

For the following reasons, these arguments fall short:

■■■ 1. Western World concedes, albeit in the context of its duty-to-indemnify analysis, that "using the *Marx* analysis there can be little doubt that Shawn O'Leary's decision to use deadly force is one that can be made only after the training and education in the specialized decision-making process that goes into whether to use deadly force." Plaintiff's Motion at 8–9. Yet, Western World fails to identify any allegations against either Phillips or O'Leary in the Connors Complaint that implicate anything other than this sort of decisionmaking (*i.e.*, decisionmaking based on an officer's training and experience). Indeed, there are none. *See* Connors Complaint ¶¶ 8–25, 32, 34–35, 37–39, 41–43. In like vein, nowhere in the Connors Complaint is there a suggestion of conduct on the part of the Town and Hinton other than failure to adequately train, supervise and discipline. *See* Connors Complaint ¶¶ 26–30, 39, 41–43. The duty to defend cannot be triggered by pure speculation as to conduct or causes of action that are not either set forth in, or fairly suggested by, the allegations of the complaint. *See, e.g., Maine Mut. Fire Ins. Co. v. Gervais*, 715 A.2d 938, 940 (Me.1998) ("If the general allegations in the complaint could give rise to any set of facts that would establish coverage, then the insurer has a duty to defend.") (citation and internal quotation marks omitted). The complaint must "show[ ] an intent to state a claim within the insurance coverage." *Vigna v. Allstate Ins. Co.*, 686 A.2d 598, 599 (Me.1996) (citation and internal quotation marks omitted).[4]

2. The case that Western World cites for the proposition that allegations of general negligence suffice to trigger the duty to defend, *see* Plaintiff's Motion at 8 (citing *North East Ins. Co. v. Tanguay*, 468 A.2d 600 (Me.1983)), is inapposite. The Law Court in *Tanguay* addressed whether general allegations of negligence went beyond the scope of an exclusion for Dram Shop Act liability. *Tanguay*, 468 A.2d at 600–01. Here, the fact that there are general allegations of negligence is immaterial; the question is whether, for purposes of the comparison test, the negligent conduct

---

4. I am mindful that in *York Ins. Group of Me. v. Lambert*, 740 A.2d 984 (Me.1999)—cited by Western World in its reply brief, *see* Plaintiff's Reply at 2—the Law Court, over the dissent of three justices, found a duty to defend pursuant to "bodily injury" coverage when, "although on its face the complaint [did] not specifically include allegations of emotional distress or emotional pain and suffering, the general allegations of the interference with an expectancy of inheritance claim carr[ied] the possibility of an award for emotional distress." *Lambert*, 740 A.2d at 986. The majority relied on the Restatement (Second) of Torts, *see id.*, which states in relevant part,

"One who is liable to another for interference with a contract ... is liable for damages for ... emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference," Restatement (Second) of Torts § 774A(1)(c). This case does not assist Western World for two reasons: (i) given the nature of the exclusion in issue, the type of relief available is immaterial, and (ii) in any event, Western World—which as plaintiff bears the burden of proving its entitlement to the relief requested—elucidates no *Lambert*-like connection between pleaded and unpleaded claims.

complained of fairly is encompassed within the professional services exclusion.

3. As the Connors Complaint made clear, the Town's asserted liability was entirely derivative of Hinton's conduct in his capacity as a "policymaker" for the Town. *See* Connors Complaint ¶¶ 26–30. Thus, to the extent Hinton's alleged acts or omissions qualified as "professional services," the Royal exclusion pertained to the Town as well.

For these reasons, I conclude that Royal had no duty to defend the Connors Complaint. Inasmuch as the duty to defend is broader than the duty to indemnify, *see, e.g., Lambert,* 740 A.2d at 985, I further hold that Royal possessed no duty to indemnify the Town defendants (the Town itself, Hinton, O'Leary and Phillips) in the underlying Connors case.

Although I need not reach Western World's arguments concerning the duty to indemnify, even were I to do so the outcome would be the same. Western World argues that a particular claim of supervisory malfeasance that survived summary judgment (namely, the Town's and Hinton's asserted failure to enforce a policy that police officers carry batons) triggered the duty to indemnify. *See* Plaintiff's Motion at 9. Specifically, Western World reasons that enforcement of the baton policy would have required no particular skill or training—anyone could have detected the absence of the batons—and hence qualifies as a *ministerial rather than* a "professional" service. *See id.* I am unpersuaded.

In certain instances, activities of professionals have been held non-professional for purposes of a professional services exclusion. *See, e.g., Medical Records,* 142 F.3d at 515–16 (fee-setting component of medical records function non-professional). However, enforcement of a police baton policy requires not just visual inspection but also professional judgment (*e.g.,* if an officer did carry a baton, was it an acceptable type of baton?) and professional authority, including the power to impose discipline for infractions. As a matter of common sense, such a task would not be delegated to the Town secretary or janitor. It necessarily entailed, and was intertwined with, the professional training and judgment of a police officer. *See, e.g., Titan Indem. Co. v. Williams,* 743 So.2d 1020, 1026 (Miss.App.1999) ("Whether in the classroom or on the playground, a teacher's specialized skills, knowledge and training encompass not just the academic subject to which he is assigned, but also discipline and supervision. All of these many roles are part of the 'professional services' provided by teachers."); *Atlantic Mut. Ins. Co. v. Continental Nat'l Am. Ins. Co.,* 123 N.J.Super. 241, 302 A.2d 177, 181 (1973) ("The main thrust of the original plaintiffs' cause of action was the alleged failure of Killam Associates to observe that the contractor was violating the New Jersey State Construction Safety Code as to the manner in which the trench was fortified. The acts of Killam Associates in this respect clearly required the specialized knowledge and mental skill of a professional engineer."); *Antles v. Aetna Cas. & Sur. Co.,* 221 Cal.App.2d 438, 441–43, 34 Cal.Rptr. 508 (1963) (act of affixing heat lamp's bracket and lamp to wall was professional service, not mechanical act, inasmuch as lamp's adjustment and use required chiropractor's supervision).

## IV. Conclusion

For the foregoing reasons, the Defendant's Motion is **GRANTED,** and the Plaintiff's Motion is **DENIED.**