# United States Court of Appeals
## For the First Circuit

No. 08-1521

CENTENNIAL INSURANCE COMPANY,

Plaintiff, Appellant,

v.

ROBERT PATTERSON,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]
[Hon. David M. Cohen, U.S. Magistrate Judge]

Before

Lynch, Chief Judge,
Torruella and Stahl, Circuit Judges.

Jeffrey T. Edwards and Preti, Flaherty, Beliveau & Pachios,
LLP, on brief for appellant.
David M. Sanders, on brief for appellee.

April 23, 2009

**TORRUELLA**, **Circuit Judge**.  In this insurance coverage dispute, appellant-insurer Centennial Insurance Company ("Centennial") seeks review of the district court's grant of summary judgment to appellee-insured veterinarian Dr. Robert Patterson.  The district court declared that Centennial was obligated under an insurance policy to legally defend Patterson in a lawsuit instituted against him by Carol Murphy.  After careful consideration, we affirm the grant of summary judgment in favor of Patterson.

## I.  Background

For the purposes of summary judgment the facts are as follows.  Centennial is a New York insurance company authorized to do business in Maine.  Dr. Patterson is a doctor of veterinary medicine who practices in Maine.  Centennial provided insurance coverage to Patterson pursuant to a Veterinarian's Professional Liability Policy in effect between the parties during the period January 1, 2003 through January 1, 2005 ("the Policy").

The Policy states, in relevant part:

> II.  Defense, Settlement, Supplementary Payments
> With respect to such insurance as is afforded by this certificate:
> A. The Company shall have the right and duty to investigate any Claim or defend any Suit brought against the Insured alleging a Veterinary Incident and seeking damages on account thereof, to which this insurance applies, even if such Claim or Suit is groundless, false, or fraudulent. . . .

Common Certificate Definitions Form
D. Claim means any of the following: . . .
        2. A Suit, arbitration or other proceeding served on an Insured for damages resulting from a Veterinary Incident.
. . .
M. Veterinary Incident means any malpractice, negligent act or omission, utterance or publication of a libel or slander, or other defamatory or disparaging material:
        1. in the furnishing of professional veterinary services, . . . by the Named Insured or by any person for whom the Named Insured is legally responsible.
. . .

Relevant to this dispute, the Policy also contains the following exclusions:

III. Exclusions
This certificate does not apply to Claim or Suit based upon, arising out of, or related to: . . .
H. any actual or alleged;
1. dishonest, fraudulent, criminal, malicious act, or malicious omission by any Insured;
2. willful violation of any law, statute, ordinance, rule or regulation by any Insured.

In September 2006, Murphy initiated a pro se civil action in federal court against the State of Maine and eighty or more defendants, including Dr. Patterson, alleging various claims arising from proceedings brought against Murphy by the State of Maine for animal cruelty. Murphy had been charged by the State with animal cruelty for not providing proper food, water, or shelter to approximately sixty animals on her farm. She sought "compensatory and punitive damages" and injunctive relief, namely, the "return of all [her] property."

-3-

The claims against Dr. Patterson arose from his alleged testimony against Murphy at an Animal Possession Hearing, which was held on March 19, 2004 (the "Hearing"), and also, Dr. Patterson's alleged examination of her animals in connection with those proceedings.[1]

---

[1] Murphy's complaint, a 60-page document labeled "Second Amended Judicial Brief," included the following claims:

1. This action is brought by the Plaintiff . . . to remedy [various violations] by State Officials and others . . . that deprived CAROL MURPHY . . . of rights, privileges or immunities secured or legally protected by the United States Constitution and Amendments, Civil Rights and Human Rights and the laws of the United States.

2. These specifically include but are not limited to those rights, privileges and immunities found in and secured and/or protected by the Constitution [and various provisions therein]. . . also the Constitutional right to be protected from . . . perjury and subornation of perjury, libel, slander, malfeasance, misfeasance, nonfeasance . . . etc. . . .

129. . . . DR. PATTERSON D.V.M. . . . of CLEARWATER VETERINARY HOSPITAL . . . testified [at the Animal Possession Hearing] that Ms. Murphy's animals were in horrible condition, no veterinary care, no food, no water, were filthy, that the house had six inches of feces on the floors and that the animals had received no food or water for months. This is again racketeering, perjury, collusion, color of law crimes, conspiracy to deprive Ms. Murphy of her legal property, conspiracy to deprive Ms. Murphy of the full enjoyment of her 30 acre farm, tampering with evidence in a criminal trial, tampering with the outcome of the trial by falsifying evidence and more. These acts were committed willfully, knowingly with intent and malice aforethought for personal gain and for the gain of State of Maine allowing domestic terrorists free reign.
. . .
184. . . . Patterson of Clearwater testified that two calves that died expired because they had no food and water. In fact those animals had been purchased at auction and were dying when purchased. . . . Patterson had never asked the condition of the animals when purchased from auction, and he did not know how long they had been in Ms. Murphy's care. Additionally under the law Ms.

-4-

Dr. Patterson submitted a copy of Murphy's complaint to Centennial and requested that Centennial tender a defense on his behalf, pursuant to the Policy.  Centennial denied Dr. Patterson's request on the ground that it did not have a duty to defend or indemnify Dr. Patterson with respect to the Murphy suit because the suit fell outside the Policy's coverage.  Centennial then brought the instant declaratory judgment action in the federal district court for the District of Maine, seeking a declaration that it did not have an obligation to defend and indemnify Dr. Patterson against the claims asserted by Murphy.  Meanwhile, Dr. Patterson hired an attorney and provided for his own defense in the Murphy suit.  On June 25, 2007, while Centennial's action was pending before the district court, Murphy's complaint was dismissed with

Murphy as the legal owner of the animals did not give permission for Patterson to do anything to her animals whether they were alive or dead.  Patterson was working in collusion with . . . others in the domestic terrorist racketeering scheme against Ms. Murphy. . . .  Patterson perjured himself on the witness stand. . . . Patterson is guilty of treating stolen animals without getting permission from the legal owner.  He is guilty of collusion, racketeering, tampering with evidence in a criminal trial, tampering with the jury, tampering with the disposition of a criminal case and violating Ms. Murphy's right to an impartial trial.  He failed to report the theft of her animals and the racketeering scheme to the proper authorities for investigation. All are criminal acts.
. . .
185. . . . Patterson is guilty of perjury, theft of animals, transporting stolen animals, receipt of stolen animals, tampering with the jury, falsifying photographic evidence in a criminal trial, tampering with the outcome of a criminal trial, racketeering, domestic terrorism, violating Ms. Murphy's U.S. Constitutional rights and more.

-5-

prejudice. Centennial's subsequent motion to dismiss this action as moot, based on the dismissal of the underlying suit, was denied on grounds that a factual dispute remained over "whether [Dr. Patterson] had incurred attorneys fees and costs and, if so, a legal dispute over whether they are recoverable from the plaintiff under a duty to defend." The parties then each filed motions for summary judgment. A magistrate judge recommended that Dr. Patterson's motion for summary judgment be granted, and Centennial's be denied, finding that Centennial had a duty under the Policy to defend Dr. Patterson in the Murphy action. On March 26, 2006 the district court entered an order adopting that recommendation. At that point in time, Dr. Patterson had incurred $121.00 in attorney's fees defending himself in the underlying Murphy action, and $3,036 in connection with establishing Centennial's duty to defend in the instant suit. Centennial now appeals.

## II. Discussion

### A. Standard of Review

This case comes before us under our diversity jurisdiction and the parties agree that we must apply Maine law to the resolution of the issues in dispute. See Douglas v. York County, 433 F.3d 143, 149 (1st Cir. 2005).

We apply de novo review to the district court's decision because the issues were "resolved on summary judgment and because

-6-

under Maine law '[w]hether an insurer has an obligation to defend its insured against a complaint is a question of law.'" <u>Bucci</u> v. <u>Essex Ins. Co.</u>, 393 F.3d 285, 290 (1st Cir. 2005) (quoting <u>Elliot</u> v. <u>Hanover Ins. Co.</u>, 711 A.2d 1310, 1312 (Me. 1998)) (alteration in original).

### B.  Applicable Law

Both Centennial and Dr. Patterson agree that Maine law employs the "comparison test" to determine whether an insurer has a duty to defend an insured.  <u>See</u> <u>Barrett Paving Materials, Inc.</u> v. <u>Cont'l Ins. Co.</u>, 488 F.3d 59, 63 (1st Cir. 2007) (citing <u>Travelers Indem. Co.</u> v. <u>Dingwell</u>, 414 A.2d 220, 224 (Me. 1980)).  "The reviewing court is required to '[lay] the underlying damage complaint[ ] alongside the insurance policy and then determine[ ] [whether] the pleadings [are] adequate to encompass an occurrence within the coverage of the policy.'"  <u>Id.</u> (quoting <u>Dingwell</u>, 414 A.2d at 224) (modifications in original).  "Under this comparison test, the insurer has a duty to defend if the underlying complaint discloses a '<u>potential</u> or a <u>possibility</u>' for liability within the policy's coverage."  <u>Bucci</u>, 393 F.3d at 290 (quoting <u>Elliott</u>, 711 A.2d at 1312) (emphasis in original).  In other words, "'[g]iven the possible existence of <u>any legal or factual basis</u> for payment under a policy, an insurer's duty to defend should be decided summarily in favor of the insured.'"  <u>Id.</u> at 292 (quoting <u>Gibson</u> v. <u>Farm Family Mut. Ins. Co.</u>, 673 A.2d 1350, 1352 (Me. 1996))

-7-

(emphasis in original); see also NE Props., Inc. v. Chi. Title Ins. Co., 660 A.2d 926, 927 (Me. 1995) ("The insured is entitled to a defense if there exists any legal or factual basis which could be developed at trial which would obligate the insurers to pay under the policy." (internal quotation marks omitted)). "Significantly, '[t]he duty to defend is broader than the duty to indemnify, and an insurer may have to defend before it is clear whether there is a duty to indemnify.'" Bucci, 393 F.3d at 292 (quoting Commercial Union Ins. Co. v. Royal Ins. Co., 658 A.2d 1081, 1083 (Me. 1995)).

"Maine law is very clear that the inquiry [under the comparison test] 'is based exclusively on the facts as alleged rather than on the facts as they actually are.'" Barrett Paving, 488 F.3d at 63 (quoting Dingwell, 414 A.2d at 224). Moreover, we note that under Maine law, at least in some circumstances, "the duty of an insurance company to defend one count in a lawsuit imposes a duty to defend all counts." Gibson, 673 A.2d at 1354. Finally, as a general rule, "a standard policy of insurance" under Maine law must be interpreted "most strongly against the insurer." Id. at 1353 (internal quotation marks omitted).

### C.  Potential for Coverage within Scope of Policy

Centennial argues that it had no duty to defend Dr. Patterson in the Murphy action because the Murphy complaint did not allege a "veterinary incident," as the term is defined in the Policy. As noted above, the Policy defines "veterinary incident"

as "any malpractice, negligent act or omission, utterance or publication of a libel or slander, or other defamatory or disparaging material . . . [i]n the furnishing of professional veterinary services." In support of its position that no "veterinary incident" was alleged, Centennial argues that (a) the Murphy complaint makes no claims of malpractice or negligence in the "furnishing of professional veterinary services" and that (b) the Murphy complaint makes no claims of libel, slander or defamation against Dr. Patterson - but only against certain media outlets. We disagree.

As to Centennial's first argument, it is true that the Murphy complaint does not explicitly assert that Dr. Patterson was negligent or committed malpractice in the furnishing of professional veterinary services. However, the complaint <u>does</u> contain several allegations of wrongful conduct by Dr. Patterson that could "potentially" be so construed.

As a threshold matter, we reject Centennial's contention that the claims asserted against Dr. Patterson related "exclusively to Dr. Patterson's testimony at the Animal Possession Hearing." Rather, Murphy's statement, at paragraph 184 of the complaint, that Dr. Patterson "testified that two calves that died expired because they had no food and water" implies that Dr. Patterson examined the deceased calves in order to reach a professional conclusion regarding their cause of death, and that Murphy's claims arise, in

-9-

part, from that examination. This inference, that Dr. Patterson examined the animals, is further supported by Murphy's statement that she "did not give permission to Patterson to do anything to her animals whether they were alive or dead." Furthermore, Murphy's allegation that "Patterson is guilty of treating stolen animals without getting permission from the legal owner," is a claim against Dr. Patterson which does not arise solely from his testimony against Murphy but also from actions taken by Dr. Patterson toward Murphy's animals, either when they were living, or after they had died.

Taken together, Murphy's allegations suggest that Dr. Patterson not only testified against Murphy, but performed some type of professional veterinary service on Murphy's animals, which Murphy regarded as wrongful in being carried out without her authorization, wrongful in approach (because Dr. Patterson did not ask her about the calves' origin and prior condition), and wrongful in result (because Dr. Patterson erroneously faulted Murphy for their death). As such, Murphy's complaint can be construed as including claims arising out of veterinary malpractice or negligence; claims which, if proven, potentially fall within the Policy's coverage. We reiterate that a "potential" of a "claim within the policy" is all that is required, under Maine law, to trigger Centennial's duty to defend. See J.A.J., Inc. v. Aetna Cas. & Sur. Co., 529 A.2d 806, 808 (Me. 1987) (stating that "[i]t

-10-

is not essential that the complaint specifically and unequivocally make out a claim within the policy" but only that it raise "a potential . . . that the facts ultimately proved may come within the coverage").

We hold that the allegations of the complaint contain sufficient facts to state a claim of negligence or malpractice potentially covered by the Policy. We need not go any further, as this conclusion is sufficient to activate Centennial's duty to defend Dr. Patterson in the underlying suit. Nevertheless, we also hold, contrary to Centennial's assertions, that the duty to defend is independently triggered by our view that Murphy potentially alleged that Dr. Patterson, among other defendants, committed libel and slander against her.

The Policy language clearly includes within the scope of coverage claims against the insured alleging the "utterance or publication of a libel or slander, or other defamatory or disparaging material . . . in the furnishing of professional veterinary services." Centennial disputes the applicability of this provision by arguing that Murphy's allegations of libel, slander and defamation were directed at defendants in the complaint other than Dr. Patterson, namely, certain media outlets that published newspaper accounts of the proceedings against Murphy. This is certainly one plausible interpretation of the complaint, in that the specific claims of libel and slander enumerated in the

complaint were directed towards various media outlets.[2] Nevertheless, there is another plausible interpretation. In paragraph 2 of her complaint, Murphy makes general claims of libel and slander which, at paragraph 1, she directs towards "State Officials and others." Based on these broadly worded provisions, the complaint may be reasonably construed as potentially stating a defamation claim against any of the defendants, including Dr. Patterson. See Dingwell, 414 A.2d at 227 (noting that with "the great latitude with which pleadings are construed today, and the great latitude of amendment, an insured's right to a defense should not be foreclosed unless such a result is inescapably necessary" (quoting Donnelly v. Transp. Ins. Co., 589 F.2d 761, 765 (4th Cir. 1978)). Moreover, this construction of paragraph 2's libel and slander claim as potentially applicable to Dr. Patterson, is bolstered by the language of the complaint at paragraph 129, where Murphy alleges that Dr. Patterson provided untruthful and damaging testimony against her at the animal repossession hearing. Reading these portions of the complaint together, we can reasonably infer that Murphy may have intended to state a claim against Dr. Patterson for defamation -- a claim that, if proven, would

[2] For example, at paragraph 151 of the Complaint Murphy alleges that the Morning Sentinel newspaper committed "libel and slander" by "print[ing] the story without checking their facts." At para. 157 of the Complaint Murphy makes similar claims against the Kennebec Journal, alleging that this publication was also "guilty of libel and slander" in printing a story about the conditions on Murphy's farm.

-12-

potentially trigger coverage under the Policy. See Me. State Acad. of Hair Design, Inc. v. Commercial Union Ins. Co., 699 A.2d 1153, 1156 (Me. 1997) ("'Even a complaint which is legally insufficient to withstand a motion to dismiss gives rise to a duty to defend if it shows an intent to state a claim within the insurance coverage.'" (quoting Dingwell, 414 A.2d at 226) (emphasis added)). Finally, that Murphy had such intent is supported by the overall nature of the complaint, which evidences a general intent on the part of the pro se plaintiff to state the broadest array of claims against the greatest number of potential defendants, in hopes of maximizing the potential for recovery.

Centennial further disputes the applicability of the "libel and slander" provision on grounds that any libel or slander alleged to have been committed by Dr. Patterson took place during his testimony at the Hearing, and thus, was not delivered "in the furnishing of professional veterinary services," as required to trigger coverage under the Policy. Centennial suggests that the furnishing of "professional veterinary services" must necessarily involve some form of malpractice or negligence in the treatment of an animal. However, we hold that the Policy definition, which specifically includes within the scope of coverage the "utterance or publication of a libel or slander," an event which, as noted by the district court is "unlikely to occur while a veterinarian is physically treating an animal," suggests that the provision has

broader applicability. In any event, courts interpreting the term "professional services" in the context of determining coverage under an insurance policy have generally defined the term broadly, so as to embrace all activities for which the specialized training of the particular profession is required. See, e.g., Med. Records Assoc., Inc. v. Am. Empire Surplus Lines Ins., 142 F.3d 512, 515 (1st Cir. 1998) (defining "professional services" under Massachusetts law as "embrac[ing] those activities that distinguish a particular occupation from other occupations -- as evidenced by the need for specialized learning or training -- and from the ordinary activities of life and business"); W. World Ins. Co. v. Am. & Foreign Ins. Co., 180 F. Supp. 2d 224, 231 (D. Me. 2002) (defining "'professional' act or service" under Maine law as "one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill" (quoting Marx v. Hartford Accident & Indem. Co., 157 N.W.2d 870, 871-72 (Neb. 1968)). Thus, we agree with the district court that "[Patterson] could only have been testifying in that proceeding as a veterinarian," that "[t]estifying as a professional veterinarian, as an expert witness, must logically be included in the scope of 'professional veterinary services' [absent an applicable exclusion]," and therefore, Dr. Patterson's "act of testifying constituted 'the furnishing of professional veterinary services' within the meaning of that term as used in the policy." We thus

find that at least some of the claims against Dr. Patterson contained in the Murphy complaint arise out of a "veterinary incident," and as a result, potentially fall within the scope of coverage.

### D.  Effect of Policy Exclusions

Alternatively, Centennial argues that it had no duty to defend Dr. Patterson because it was relieved of any such duty by Exclusion H in the Policy, a provision which excludes from coverage any suit arising out of or related to "[a]ny actual or alleged . . . dishonest, fraudulent, criminal, malicious act, or malicious omission" or any "willfull violation" by the insured.  Centennial contends that, even if the allegations in the Murphy complaint do arise out of an otherwise covered veterinary incident, "[a]ll of the allegations against Patterson describe dishonest, fraudulent or criminal conduct on his part," and thus, fall within the scope of Exclusion H.  According to Centennial, "there is no potential that Patterson's alleged conduct did not involve a dishonest, fraudulent, criminal, malicious act, or malicious omission." Centennial acknowledges that a full trial might have ultimately disclosed that Dr. Patterson's actions were not, in fact, dishonest, fraudulent, or criminal, but argues that such considerations are irrelevant under the comparison test, which hinges the duty to defend "exclusively on the facts as alleged rather than on the facts as they actually are."  Barrett Paving,

-15-

488 F.3d at 63 (emphasis added & internal quotation marks omitted). The "triggering of Exclusion H," according to Centennial, "eliminates any potential for coverage under the [Policy]."

We disagree with the premise upon which Centennial's argument rests -- that there was "no potential" that the allegations against Patterson involved a claim not barred under Exclusion H. It is true that many of Murphy's claims, albeit in a conclusory manner, allege that Patterson committed various crimes, such as racketeering and perjury. If proven, these would clearly fall within the exclusion and therefore, outside the scope of coverage. Nevertheless, it is not essential, under Maine law, that all claims against the insured in the underlying complaint raise the possibility of coverage for the insurer's duty to defend to be triggered, at least where the claims arise from common issues of fact. See Gibson, 673 A.2d at 1354.

As explained above, we find that Murphy's complaint can be construed to also state claims against Dr. Patterson for slander, libel, negligence and malpractice -- claims which, if proven, would fall outside the scope of Exclusion H, and at least potentially, within the scope of coverage. The fact that Murphy also alleged that Dr. Patterson committed various uncovered crimes in the course of the single factual scenario at issue, does not, under Gibson, relieve Centennial of the duty to defend. Id. Moreover, the fact that Murphy, a pro se plaintiff bringing a civil

action and seeking damages, characterizes all of Dr. Patterson's actions as "criminal acts" (paragraph 184 of the complaint), and uses words such as "guilty" rather than "liable" to describe Patterson's culpability, does not mean that Murphy, has, in fact, alleged criminal conduct. See Dingwell, 414 A.2d at 226 ("Whether [the insured] can obtain a defense from his insurer must depend not on the caprice of the plaintiff's draftsmanship, nor the limits of his knowledge, but on a potential shown in the complaint that the facts ultimately proved may come within the coverage."). Regardless of how Murphy chooses to classify Dr. Patterson's allegedly wrongful conduct, "the facts ultimately proved" could have potentially shown, for example, that Patterson was negligent in concluding that Murphy had caused the death of her calves, or that Patterson's statements regarding Murphy's treatment of her animals were defamatory, both non-criminal wrongs which could potentially "come within [the Policy's] coverage." See J.A.J., Inc., 529 A.2d at 808 (quoting Dingwell, 414 A.2d at 226).

Ultimately, Maine law "place[s] the burden of uncertainty as to the policy's coverage on the insurer." Dingwell, 414 A.2d at 227 (citation omitted). Because we find that Exclusion H does not necessarily foreclose coverage under the Policy, we hold that Dr. Patterson's right to a defense remains intact.

Based on the allegations in the Murphy complaint, we hold that the Centennial Policy potentially covered Murphy's claims

against Dr. Patterson, and therefore, Centennial had a duty to defend its insured.  Because we conclude that Centennial had a duty to defend, we further conclude that the district court correctly granted summary judgment for Dr. Patterson.

### E.  Attorney's Fees

Dr. Patterson contends that if he prevails in defending against the instant declaratory judgment action, he is entitled to recover not only the costs of his defense in the Murphy suit, but also the costs of establishing Centennial's duty to defend in this action.

Maine law provides by statute that "when there is a declaratory judgment action 'to determine an insurer's contractual duty to defend an insured under an insurance policy, if the insured prevails in such action, the insurer shall pay court costs and reasonable attorney's fees.'"  Foremost Ins. Co. v. Levesque, 926 A.2d 1185, 1188 (Me. 2007) (quoting 24-A M.R.S. § 2436-B(2)). However, we find, as did the district court, that Dr. Patterson's request for attorney's fees remains premature.  See D. Me. R. 54.2 (providing that application for attorney's fees "shall be filed within 30 days of the filing of the appellate mandate providing for the final disposition of any appeal to the Court of Appeals"). Thus, we leave it to the district court to resolve this issue at the appropriate time.

## III.  <u>Conclusion</u>

For the foregoing reasons, the summary judgment entered in favor of Patterson and against Centennial is affirmed.

**<u>Affirmed</u>**.