257 F.Supp.2d 1217 (2003)
JEROME GROUP, INC., Plaintiff, Counter-Defendant,
v.
CINCINNATI INSURANCE CO., Defendant, Counter-Claimant.
Jerome Group, Inc., Plaintiff,
v.
United States Fidelity & Guaranty Co., Defendant.
No. 4.01CV0479 TCM, 4:01CV1577 TCM.
United States District Court, E.D. Missouri, Eastern Division.
March 3, 2003.
*1218 Mark C. Kodner, Albert S. Watkins, Kodner and Watkins, Clayton, MO, L. Steven Goldblatt, St. Louis, MO, for Jerome Group, Inc.
Russell F. Watters, Managing Principle, Ryan J. Gavin, Brown and James, P.C., St. Louis, MO, for Cincinnati Ins. Co.

MEMORANDUM AND ORDER
MUMMERT, United States Magistrate Judge.
This consolidated[1] diversity action is before the Court[2] on four motions for summary judgment: the motion of Jerome Group, Inc. ("Plaintiff) for summary judgment against defendant Cincinnati Insurance Company ("Cincinnati") and its motion for summary judgment against defendant United States Fidelity and Guaranty Company ("USF & G"); the motion of Cincinnati for summary judgment against Plaintiff; and the motion of USF & G for summary judgment against Plaintiff. [Docs. 50, 51, 57, 58]

Background
Plaintiff, a Missouri corporation, is in the business of graphic communications and printing, and provided such services to Group Health Plan ("GHP"). (Stip. ¶¶ 1, 2.)[3] In November 1997, GHP requested that Plaintiffs can and index medical records for storage on CD-ROMs in a retrievable format. (Id. ¶ 3.) Plaintiff could not perform this type of work in-house, and so advised GHP. (Id. ¶ 4.) Plaintiff and GHP then agreed that Plaintiff would provide the requested service through a subcontractor. (Id. ¶ 5.) Subsequently, Plaintiff contacted John Knabenshue, one of the *1219 owners of The Paper Solution Group, Inc. ("PSG"). (Id. ¶ 6.) PSG helped Plaintiff prepare a quote and proposal for GHP for the requested service. (Id. ¶¶ 7-8.) The proposal was submitted on PSG letterhead and read that it was prepared for GHP by Plaintiff. (Id. ¶ 8; Cinn. Ex. B.) Under this proposal, Plaintiff would charge GHP 55 cents per page for back-file conversion and 65 cents per page for ongoing imaging services. (Id.) Plaintiff, in turn, was being charged by PSG 49.5 cents per page on the back-file conversion and 58.5 cents per page on the ongoing imaging services. (Kohn Dep. at 33; Cinn. Ex. 6.) Indexing was an additional charge. (Kohn Dep. at 33.)
Plaintiff and GHP agreed on the proposal in November 1997. (Kohn Dep. at 40; Stip. ¶ 10.)
In order to perform the agreed-upon services, PSG rented space from Plaintiff. (Id. ¶ 11.) PSG would then have boxes of the material to be scanned brought by courier from GHP and would scan the material, repackage it, and have it taken back to GHP. (Id.)
Beginning the next month, in December 1997, Plaintiff would receive an invoice from PSG, add its mark-up, and then invoice GHP for the revised amount. (Id. ¶ 12; Kohn Dep. at 42.) For example, PSG billed Plaintiff on November 21 for 154,371 pages of back-file conversion at 49.5 cents per page and 38,593 pages for the ongoing scanning services at 58.5 cents per page. (Cinn.Ex. 8.) On December 5, Plaintiff billed GHP for the same services and the same number of pages but at a rate of 55 cents per page for the back-file conversion and 65 cents per page for the ongoing scanning services. (Id.) The last invoice Plaintiff received from PSG was dated August 31, 1998. (Id.) Plaintiff billed GHP on September 10 for the last PSG services. (Id.)
In July or August 1998, GHP stopped paying Plaintiffs invoices. (Stip. ¶ 14; Kohn Dep. at 46.) When contacted by Plaintiff about why GHP was not paying the invoices, GHP advised Plaintiff that there were discrepancies between the number of pages listed on the invoices as being converted or scanned and the number actually converted or scanned. (Id.) GHP further informed Plaintiff that it would be conducting an internal audit to determine what had happened. (Id.) In turn, Plaintiff contacted PSG and stopped paying its invoices.[4] (Stip. ¶ 15; Kohn Dep. at 47-48.) PSG denied billing Plaintiff for more pages than were converted or scanned for GHP but agreed to audit its records. (Id. at 48.)
John Knabenshue informed Plaintiff of the results of PSG's audit by letter dated December 1, 1998. (Cinn.Ex. G.) That audit concluded that the total scanning and converting charges based on the number of pages would be $176,104.22 and additional charges for items such as reassembling the documents after scanning, having to scan some documents again, charges for storage, etc., were $119,259.44. (Cinn.Ex. G.) These charges were the amounts that PSG should have billed Plaintiff regardless of any markup by Plaintiff before billing GHP. (Id.) PSG attributed the total amount of overbilling$295,000to discussions and agreements between PSG and GHP in which Plaintiff had not participated and of which Plaintiff was not aware. (Stip.¶ 17.) PSG, however, did not have the funds to refund to Plaintiff the amount overtoiled. (John Knabenshue Dep. at 53.)
Plaintiff, in turn, informed PSG of the results of its audit on December 9. (USF & *1220 G Dep. Ex. 3.) Plaintiff concluded that PSG had billed it for 6,466,383 back-file scans but had actually scanned only 1,996,232 pages and had billed it for 1,829,501 daily scans but had actually scanned only 806,124 pages. (Id.) Plaintiff concluded that it had been overcharged a total of $281,198.52. (Id.)
By letter of October 18, 1999, GHP advised Plaintiff of the results of its audit. (Cinn.Ex. F.) That audit concluded that GHP had been overbilled in the amount of $322,755.25, before the subtraction of any unpaid invoices. (Id.) The amount owed in unpaid invoices was $104,345.04, leaving a balance due GHP of $218,410.20. (Id.) GHP denied having the discussions and agreements with PSG cited by PSG as the basis for the overbilling. (Stip. ¶ 17.)
Ten days later, Plaintiff notified its insurance broker, Fonda Hereford with Anderson, Hall, Marsh, and Company, that it was submitting GHP's claim for the $322,755.25 "overbill[ed]" to Cincinnati. (Id. ¶ 18; Cinn. Ex. H.) It was Plaintiffs position that the claim was covered under its errors and omissions printers Policy, its comprehensive general liability policy, and/or its umbrella policy. (Id.) Cincinnati declined coverage. (Cinn.Ex. N.)
After John Knabenshue advised Plaintiff of the results of PSG's audit but before GHP reported its audit results in October 1999, Plaintiff filed a four-count suit against PSG, John Knabenshue, and Jeff Knabenshue, also an officer of PSG, in the Circuit Court of St. Louis County for the State of Missouri. (USF & G Ex. 4.) In that suit, Plaintiff alleged that PSG knowingly invoiced Plaintiff for more images than were actually scanned, that an accounting conducted by Plaintiff and GHP concluded that Plaintiff had paid PSG $281,198.52 more than was owed, and that PSG had acknowledged the inaccuracies and had promised to refund to GHP the excess payment remitted by GHP. (Id. ¶¶ 9, 13-14.) Jeff Knabenshue testified in his deposition that he did not know at the time he was billing Plaintiff that the invoices were for more pages than were actually scanned. (Jeff Knabenshue Dep. at 155, 204-05.)
After being sued by Plaintiff, John Knabenshue, his son Jeff Knabenshue, and PSG filed separate bankruptcy petitions. (John Knabenshue Dep. at 66; Jeff Knabenshue Dep. at 68, 161-62; USF & G Stip. ¶ 24.) In July 1999, Plaintiff filed an adversary proceeding in the two Knabenshues' bankruptcy cases contesting the discharge of the overbilling debt. (John Knabenshue Dep. at 67; Jeff Knabenshue Dep. at 163-64; USF & G Ex. 10.) Plaintiff alleged in the adversary proceedings that "PSG knowingly, or with reckless disregard for the accuracy of PSG's Invoices, invoiced [Plaintiff] for images purportedly generated for GHP in connection with the Project, in an amount grossly in excess of the actual number of images generated[.]" (USF & G Stip. ¶ 17.) As a result of PSG's misrepresentations, Plaintiff "overpaid] PSG in the amount of $281,198.52" and was damaged in the amount of $281,198.52. (Id. ¶¶ 42-43, 52.)
The following month, Plaintiff dismissed without prejudice its St. Louis County action. (USF & G Ex. 12.)
Two months later, in October 1999, Plaintiff amended its complaint in the adversary proceedings. (USF & G Ex. 13.) The amended complaint alleged that PSG's and the Knabenshues' debt to Plaintiff arising out of the GHP agreement was not dischargeable because the underlying misrepresentations were (a) fraudulently made or were made with reckless disregard for the truth and (b) resulted in a willful and malicious injury. (Id.) Plaintiff further alleged that as a result of PSG's misrepresentations Plaintiff overpaid PSG in the amount of $271,881.09 and was, consequently, *1221 damaged in the amount of $271,881.09. (Id ¶¶ 47, 48.) The adversary proceedings were settled with an agreement that John and Jeff Knabenshue each pay Plaintiff $20,000.00. (John Knabenshue Dep. at 68-69; Jeff Knabenshue Dep. at 70, 175-76; USF & G Stip. ¶ 34.) The $40,000.00 was to be refunded if Plaintiff recovered any money from USF & G. (Jeff Knabenshue Dep. Ex. E. ¶ 7.)
Plaintiff then initiated a second suit in July 2000 against PSG in the Circuit Court of St. Louis County. (Jeff Knabenshue Dep. at 170; Cinn. Ex. I.) John and Jeff Knabenshue were not named as defendants in this suit. The suit was titled "Plaintiffs Petition for Damages for Negligence." (Id) Plaintiff alleged in this suit that "PSG was negligent and careless in invoicing Plaintiff under The Plan for images generated for and on behalf of GHP in furtherance of The Project in excess of the actual number of images generated." (Id. ¶ 9.) A year later, in August 2001, Plaintiff and PSG agreed to a consent judgment, which was approved by the court. (Cinn.Ex. 5.) The judgment provided, in part, that "the pleading of the claim as one in negligence or that other matters pleaded, shall not be binding on [PSG's] insurance carrier in any future action regarding coverage under any Policy of Insurance." (Id) Judgment was entered against PSG in favor of Plaintiff in the total amount of $393,105.00. (Id) This amount represented a $75,000.00 cash payment made by Plaintiff to GHP; $106,105.00 for Plaintiffs outstanding invoices to GHP that were written off; and $212,000.00 for claimed lost profits from sales to GHP over the course of three years. (Id)
In this consolidated action, Plaintiff alleges in its complaint against Cincinnati that Plaintiff has sustained $400,000 in damages, including a $175,000 settlement of GHP's claims against Plaintiff, unpaid invoices, and lost profits, and seeks recovery for such under three policies issued by Cincinnati: an errors and omissions printers policy; a comprehensive general liability policy; and an umbrella policy. On the other hand, Cincinnati has filed a counterclaim requesting that a judgment be entered declaring that no coverage exists for the claimed loss. In its complaint against USF & G, Plaintiff seeks recovery of the $396,000.00 judgment entered in its favor in the St. Louis County Circuit Court case. Plaintiff alleges that such recovery is merited under an errors and omissions policy issued to PSG by USF & G.
In the pending motions for summary judgment, the insurance companies argue that Plaintiffs claims are precluded under the unambiguous language of the applicable policies and Plaintiff argues that a reading of the ambiguous terms of policies mandate coverage.

Discussion
Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir.1992) (citations omitted). See also Carter v. St. Louis Univ., 167 F.3d 398, 401 (8th Cir. 1999) (same holding). After the moving party discharges its initial burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor, see City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., *1222 Inc., 838 F.2d 268, 273 (8th Cir.1988), the non-moving party must do more than show that there is some doubt as to the facts, see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the non-moving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Moreover, where the unresolved issues are primarily legal, rather than factual, summary judgment is particularly appropriate. See Adams v. Boy Scouts of AmericaChickasaw Council, 271 F.3d 769, 775 (8th Cir.2001); Gordon v. City of Kansas City, Mo., 241 F.3d 997, 1002 (8th Cir.2001).
The unresolved issues relevant to the pending motion are legal, not factual. See Indiana Lumbermens Mut. Ins. Co. v. Timberland Pallet and Lumber Co., 195 F.3d 368, 377 (8th Cir.1999) ("Where the facts upon which liability is claimed or denied under an insurance policy are undisputed and the existence or amount of liability depends solely upon a construction of the policy, the question presented is one of law ...") (interim quotations omitted); Devine v. Gateway Ins. Co., 60 S.W.3d 6, 9 (Mo.Ct.App.2001) ("The interpretation of the meaning of an insurance policy is a question of law."); American States Ins. Co. v. Broeckelman, 957 S.W.2d 461, 467 (Mo.Ct.App.1997) ("Whether or not the language of an insurance policy is ambiguous is a question of law.").
Missouri law is applicable[5] and is clear on the standard governing the interpretation of insurance policies. "`When the court can determine the meaning of a[n insurance policy] without any guide other than knowledge of the simple facts on which, from the nature of language in general, its meaning depends, the terms of the [policy] will be deemed unambiguous. To be unambiguous, a [policy] must be reasonably capable of only one construction ..."' State Farm Mut. Auto. Ins. Co. v. Esswein, 43 S.W.3d 833, 841 (Mo.Ct.App.2000) (quoting Williston on Contracts, Section 30:4 (4th ed.)) (all but last alteration added). "`If an insurance policy is unambiguous, it is to be enforced according to its terms[.]'" Indiana Lumbermens Mut. Ins. Co., 195 F.3d at 377 (quoting Broeckelman, 957 S.W.2d at 467) (alteration added). An insurance policy is not ambiguous simply because the parties disagree over its meaning, Uhle v. Tarlton Corp., 938 S.W.2d 594, 600 (Mo.Ct.App.1997), nor because the language appears in a restrictive provision of the policy, Indiana Lumbermens Mut. Ins. Co., 195 F.3d at 377.
If, however, an insurance policy is ambiguous, it is construed against the insurer. Id. "`If the language of a policy is ambiguous (if there is duplicity, indistinctness or uncertainty in its meaning), and therefore open to different constructions, then it will be interpreted in the manner that would ordinarily be understood by the lay person who bought and paid for the policy. Additionally, exclusionary clauses of policies are strictly construed against the insurer, and if they are ambiguous they will be construed favorably to the insured.'" Id. (quoting Broeckelman, 957 S.W.2d at 467). The burden of showing that an exclusionary clause is applicable is on the insurer. American States Ins. Co. v. Herman C. Kempker Const. Co., 71 S.W.3d 232, 235 (Mo.Ct.App.2002); American States Ins. Co. v. Mathis, 974 S.W.2d 647, 649 (Mo.Ct. App.1998).
*1223 "In determining whether an ambiguity exists, `[a]ll provisions of a policy ... must, if possible, be harmonized and given effect in order to accomplish the intention of the parties[,]'" Farmers Ins. Co. v. Pierrousakos, 255 F.3d 639, 642 (8th Cir. 2001) (quoting Automobile Club Inter-Ins. Exchange v. Farmers Ins. Co., 778 S.W.2d 772, 774 (Mo.Ct.App. 1989)) (last alteration added); however, an ambiguity does exist if policy language "promises something in one point and takes it away in another," Kellar v. American Family Mut. Ins. Co., 987 S.W.2d 452, 455 (Mo.Ct.App.1999). In determining whether the language in an insurance policy is ambiguous, "the subjective understanding of a particular insured is not controlling." United Fire & Casualty Co. v. Gravette, 182 F.3d 649, 655 (8th Cir.1999).
Additionally, the burden of proving coverage is on the party seeking to recover under the policy, i.e., Plaintiff. See Citizens Ins. Co. of America v. Leiendecker, 962 S.W.2d 446, 451 (Mo.Ct.App.1998). "`An insured must bring itself within the terms of the policy and must carry the burden of offering substantial evidence that the underlying claim is covered by the policy.'" Trans World Airlines, Inc. v. Associated Aviation Underwriters, 58 S.W.3d 609, 618-19 (Mo.Ct.App.2001) (quoting American States Ins. Co. v. Vortherms, 5 S.W.3d 538, 543 (Mo.Ct.App. 1999)). Thus, Plaintiff "bears the burden of making a prima facie case that coverage exists" for the loss at issue. Id. at 621.
Claims Against and By Cincinnati: Errors and Omissions Policy. The relevant language in the printers errors and omissions insurance policy language provides as follows:
SECTION I COVERAGES
1. Insuring Agreement
a. We will pay those sums that the insured becomes legally obligated to pay as damages caused by any negligent act, error or omission of the insured or any other person for whose acts the insured is legally liable arising out of the rendering or failing to render "printing services." This insurance applies only to negligent acts, errors or omissions which occur during the policy period and take place in the "coverage territory." We will have the right and duty to defend any "suit" seeking those damages.
(Cinn.Ex. L, § I, No. 1(a).) Printing services are defined as "those activities usual to the process of producing printed matter." (Id § V.3.) The policy specifically excludes losses "resulting from cost guarantees or estimates of probable cost or cost estimates being exceeded." (Id § I.2.k.)
"A professional errors and omissions insurance policy provides limited coverage, usually as a supplement to a general comprehensive liability policy, for conduct undertaken in performing or rendering professional acts or services." Medical Records Assocs., Inc. v. American Empire Surplus Lines Ins. Co., 142 F.3d 512, 513 (1st Cir.1998). Neither the Court nor the parties could find either a Missouri or Eighth Circuit Court of Appeals case defining "professional services." The Court does find, however, the definition of "professional services" quoted in Medical Records to be apt.
"The term `professional' in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A `professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, *1224 rather than physical or manual.... In determining whether a particular act is of a professional nature or a `professional service' we must look not to the title or character of the party performing the act, but to the act itself."
Id. (quoting Marx v. Hartford Accident & Indem. Co., 183 Neb. 12, 157 N.W.2d 870, 872 (1968)) (alterations in original). The "bottom line" was that the "professional services" referred to in the errors and omissions policy "embrace [d] those activities that distinguish a particular occupation from other occupationsas evidenced by the need for specialized learning or trainingand from the ordinary activities of life and business." Id. See also Visiting Nurse Ass'n of Greater Philadelphia v. St. Paul Fire and Marine Ins. Co., 65 F.3d 1097, 1101 (3rd Cir.1995) ("A `professional' act or service is one arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor, or skill." (interim quotations omitted)). "The relevant consideration is not the title or character of the party performing the act but the act itself." Id.
In the instant case, it is undisputed that scanning GHP's claims and converting its back files to a retrievable format on CROM required specialized skills and learning. It is also undisputed that this work was not performed by Plaintiff, but was performed by PSG with no control, management, or input from Plaintiff. Indeed, when first approached by GHP about doing the conversion and scanning, Plaintiff explained that it lacked the expertise and equipment to do either. Consequently, Plaintiff contracted with PSG to do the work. That work was billed by PSG to Plaintiff at a set rate per page and was billed by Plaintiff to GHP with a set increase added to the set rate of PSG. This scheme was done with GHP's knowledge and approval. Assuming, without deciding, that the scanning and converting work of PSG would normally fall within the definition of "printing services" set forth in Plaintiffs errors and omissions policy, the fact remains that it was PSG and not Plaintiff that performed the "printing services" and that those services are not at issue. What is at issue is GHP's claim against Plaintiff for the amount that it was overbilled for the scanning and converting done by PSG and billed to GHP by Plaintiff. Plaintiff has failed to establish that the billing required specialized skill usual to printing services. Indeed, the opposite has been established. The amount of overbilling was determined not only by PSG but by Plaintiff and by GHP.[6] Plaintiff expressly denied having the skill to do the work required by GHP and GHP clearly lacked that skill. The ability of both Plaintiff and GHP to determine the amount of pages improperly included in the bills attests to the lack of specialized skill needed for the billing.
The question in Medical Records Assocs., 142 F.3d at 513, was whether an errors and omissions policy carried by a medical records processing company provided insurance coverage for overbilling claims. The company was in the business of providing patients and their attorneys copies of requested medical records. Id. After being contacted by a law firm about allegedly overcharging for records and improperly including additional charges, the company referred the claim to its insurance company. The insurer denied coverage. The First Circuit Court of Appeals agreed with the district court that the claim was not covered. Id. Acknowledging the record company's "valiant effort to depict its fee-setting activity as an integral part of the service it provides to medical *1225 patients and their representatives[,]" the court nonetheless found that "[a]s in most other businesses, the bill is an effect of the service provided, not part of the service itself." Id. at 515, 516. See also Horizon West Inc. v. St. Paul Fire & Marine Ins. Co., 214 F.Supp.2d 1074, 1078-79 (E.D.Cal. 2002) (rejecting argument by nursing home that suit alleging that home submitted claims to Medicare and Medicaid for services never performed was covered under home's errors and omissions policy and finding meritless nursing home's argument that the submission of those claims constituted professional services because they required that the persons submitting bills have specialized knowledge); Princeton Ins. Co. v. Kosoy, 1999 WL 79055 at *3 (E.D.Pa. Apr.9, 1999) (rejecting chiropractor's argument that claim for improperly billing for services never performed was covered under errors and omissions policy).
Similarly, in the instant case, the question is the amount of the Plaintiffs bill, not the printing services performed by PSG. This billing is an effect of PSG's services and is not the printing services themselves.
In support of its argument to the contrary, Plaintiff cites Lincoln County Ambulance Dist. v. Pacific Employers Ins. Co., 15 S.W.3d 739 (Mo.Ct.App.1998). The Court finds Plaintiffs reliance on this case to be misplaced. In Lincoln County, the errors and omissions policy at issue was carried by an ambulance district. The policy was for "professional services rendered" but did not define those "professional services." The policy did, however, expressly exclude activities routinely performed by an ambulance district, e.g., the rendering or failure to render medical or paramedical services, first aid, or other medical assistance and the use or operation of equipment used in any diagnostic or testing procedures. Id. at 741. The district was sued under the Fair Labor Standards Act, 29 U.S.C. § 207, for improperly classifying the employees' sleep and mealtime as noncompensable for the purposes of calculating overtime. Id. at 740. The district argued that the employees' claim was covered under its errors and omissions policy. Id. at 742. The state appellate court agreed, after first finding that an ambiguity in the term "professional services" in the errors and omissions policy was created by the absence of a definition of such services combined with the exclusion of activities normally associated with an ambulance district. Id. at 744.
There is no ambiguity in the instant case. Absent such ambiguity, the insurance policy is to be enforced according to its terms. Those terms do not allow for a construction that would define billing as a printing service.
Claims Against and By Cincinnati: Crime Coverage Policy. The crime coverage policy issued to Plaintiff by Cincinnati pays for loss of, and loss from, damage to money, securities, and property resulting from employee dishonesty. (Cinn. Ex. M at A.) "Employee" is defined as follows.
An "[e]mployee" is:
a. Any natural person:
(1) While in your service (and for 30 days after termination of service); and
(2) Whom you compensate directly by salary, wages or commissions; and
(3) Whom you have the right to direct and control while performing services to you.
b. Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding, however, any such person while *1226 having care and custody of property outside the "premises."
(Id. § C.l.a & b.)
Plaintiff argues that the Knabenshues and PSG were, at all times relevant, employees of Plaintiff; therefore, the loss they caused to Plaintiff is covered under the crime coverage policy. As noted above, "[a]n insured must bring itself within the terms of the policy and must carry the burden of offering substantial evidence that the underlying claim is covered by the policy." Vortherms, 5 S.W.3d at 543. Consequently, Plaintiff has the burden of offering substantial evidence to establish that the Knabenshues and PSG were employees of Plaintiff. Plaintiff has failed to carry this burden.
The insurance policy defines an employee as an natural person (1) in the insured's service at the time and for 30 days after termination of service; (2) compensated by the insured directly by salary, wages or commissions; and (3) directed and controlled by the insured while performing services for the insured. PSG is a juristic person and not a natural person. PSG could not, therefore, be an employee of Plaintiff.
John and Jeff Knabenshue are, clearly, natural persons. The question then is whether their status satisfies the second and third criteria.
"`In Missouri, the courts consistently turn to the Workmen's Compensation Act in determining the meaning of the word `employee' as used in ... liability insurance policies ..."' American Family Mut. Ins. Co. v. Tickle, 99 S.W.3d 25 (Mo.Ct. App.2003) (quoting Ward v. Curry, 341 S.W.2d 830, 837 (Mo.1960)) (first alteration added, second in original). That meaning is generally based on the potential employer's "right to control" the potential employee. Sisco v. Board of Trustees of the Police Ret. Sys. of St. Louis, 31 S.W.3d 114, 118 n. 8 (Mo.App. 2000). The factors to be examined when determining whether the requisite right of control exists are "(1) the extent of control, (2) the actual exercise of control, (3) the duration of the employment, (4) the right to discharge, (5) the method of payment, (6) the degree to which the alleged employer furnished equipment, (7) the extent to which the work is the regular business of the employer, and (8) the employment contract." Wilmeth v. TMI, Inc., 26 S.W.3d 476, 480 (Mo.Ct.App.2000) (citations omitted). On the other hand, "[i]n contrast to performing tasks as an employee within a masterservant relationship, an independent contractor exercises independent judgment and contracts to do a piece of work according to his own methods, without being subject to the control of his employer except as to the result of his work." Trinity Lutheran Church v. Lipps, 68 S.W.3d 552, 557 (Mo.Ct.App.2001) (interim quotations omitted).
There is no evidence that the Knabenshues were compensated by Plaintiff directly by salary, wages or commissions or that they were subject to Plaintiffs right to direct and control them in its performance of services for Plaintiff. PSG rented space from Plaintiff and provided the necessary equipment to scan, index, and create CD-ROMs. Plaintiff had neither the equipment nor the expertise to do the work required by GHP, hence its arrangement with PSG. The documents and records to be scanned were taken back and forth between PSG and GHP, with no input, supervision, or help from Plaintiff. PSG performed the work, with no input, supervision, or help from Plaintiff. PSG determined the number of pages to be billed for, Plaintiff accepted this number, added its profit, and billed GHP. There is no evidence of any control or direction by Plaintiff on the work performed by PSI.
*1227 "`An independent contractor is one who contracts with another to do something for him [or her] but is neither controlled by the other nor subject to the other's control with respect to his [or her] physical conduct in performing the undertaking.'" Lee v. Pulitzer Publ'g Co., 81 S.W.3d 625, 631 (Mo.Ct.App.2002) (quoting Tom Lange Co. v. Cleaning By House Beautiful, 793 S.W.2d 869, 871 (Mo.Ct.App.1990)) (alterations in original). PSG and the Knabenshues were clearly independent contractors whose mistakes are not covered losses under the crime coverage policy.
Claims Against USF & G. USF & G issued a technology errors and omissions liability coverage policy to PSG. USF & G argues that the claims at issue resulted from an activity, charging more per page scanned than agreed to, that is not a "covered business activity." Plaintiff argues that it is because "[t]he overbilling resulted from PSG's negligence in effectuating certain aspects of the document imaging services." (Plf. mem. at 1.)
Plaintiff and PSG having agreed that the state court consent judgment against PSG may be collected only from the proceeds of PSG's insurance policy issued by USF & G, Plaintiff has standing to bring its declaratory judgment action against USF & G. See Citizens Ins. Co. of America, 962 S.W.2d at 450.
The coverage under USF & G's policy depends on whether it is a "claims made" policy or an "occurrence" policy.
"An `occurrence' policy covers negligent acts or omissions occurring within the policy period, regardless of when the negligent acts or omissions are discovered or the claim is made." Southeast Bakery Feeds, Inc. v. Ranger Ins. Co., 974 S.W.2d 635, 639 (Mo.Ct.App.1998). "On the other hand, under a `claims made' policy, coverage is effective when the negligent acts or omission is discovered and reported to the insurer during the applicable period, regardless of when the act or omission occurred. Under a `claims made' policy, there is no coverage for late claims whether or not the insurer was prejudiced." Id. (interim citations omitted). See also Lexington Ins. Co. v. St. Louis Univ., 88 F.3d 632, 634 (8th Cir.1996) (holding to same effect); Northern v. Physicians Defense Ass'n, 88 S.W.3d 130, 134 (Mo.Ct.App. 2002) (same); Insurance Placements, Inc. v. Utica Mut. Ins. Co., 917 S.W.2d 592, 597 (Mo.Ct.App.1996) (same).
The policy issued to PSG by USF & G is a "claims made" policy. The policy was cancelled by PSG effective March 1, 1999, and the applicable 60-day extended reporting period ended May 1, 1999. It is undisputed that the only legal proceeding begun prior to expiration of the USF & G policy was the first state court lawsuit.[7] This lawsuit is the focus of both parties's arguments on whether USF & G had sufficient notice of Plaintiffs claims against PSG to trigger coverage.
Plaintiff describes its position as follows. "Although Lawsuit No. 1 did not specifically assert negligence against PSG as a cause of action, if USF & G had engaged in even a minimal amount of investigation, it should have discovered that its insured was maintaining that the circumstances giving rise to Lawsuit No. 1 ... arose as a result of PSG's negligence in [six] respects[.]" (Plf. mem. at 11.) (Alterations added.)
*1228 This argument misapprehends the burden on USF & G under a "claims made" policy. Under that policy, PSG, or Plaintiff, had to discover and report PSG's alleged negligence prior to May 1, 1999. Neither did.
Accordingly,
IT IS HEREBY ORDERED that Plaintiff Jerome Group, Inc.'s Motions for Summary Judgment are each DENIED. [Docs. 51, 58]
IT IS FURTHER ORDERED that defendant Cincinnati Insurance Company's Motion for Summary Judgment is GRANTED. [Doc. 50]
IT IS FINALLY ORDERED that defendant United States Fidelity and Guaranty Company's Motion for Summary Judgment is GRANTED. [Doc. 57]
An appropriate Judgment shall accompany this Memorandum and Order.

JUDGMENT
In accordance with the Memorandum and Order filed this date and incorporated herein,
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendants Cincinnati Insurance Company and United States Fidelity and Guaranty Company shall have judgment against plaintiff, Jerome Group, Incorporated.
NOTES
[1] On March 14, 2002, this case was consolidated with Jerome Group, Inc. v. United States Fidelity & Guaranty Company, Cause No. 4:01CV1577 CAS.
[2] The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).
[3] "Stip." refers to Cincinnati's statement of uncontroverted facts.
[4] GHP terminated PSG's services before GHP documented the overbillings. (Burke Dep. at 87.)
[5] The parties agree that Missouri law applies in this diversity action.
[6] In its state court suit against PSG and the Knabenshues, Plaintiff asked for an amount that it alleged was shown by its audit and GHP's audit to be overbilled$281,198.52.
[7] A letter was sent to John Knabenshue by a lawyer retained by Plaintiff in January 1999, before the policy expired. This letter demands the execution of a promissory note for $106,105.94 and promises a lawsuit if the note is not signed. A lawsuit was filed. Thus, the question of notice to USF & G of Plaintiff's claims may be addressed by considering only the allegations in that lawsuit.